Josef Tibor DEUTSCH, an individual; Josef Tibor Deutsch, as the survivor of George Deutsch, Plaintiffs–Appellants,

v.

TURNER CORPORATION, a Delaware Corporation with corporate regional headquarters located in California; Kitchell Corporation USA, an Arizona Corporation authorized to do business in California; Hochtief AG, a German Corporation, Defendants–Appellees.

Woodrow M. Hutchison, Plaintiff–Appellant,

v.

Mitsubishi Materials Corporation; Mitsubishi Materials USA, a business association purporting to be a California corporation; Mitsubishi Corporation, a Japanese business association; Mitsubishi International Corporation, a business association purporting to be a New York corporation; Mitsubishi Heavy Industries, Ltd., a Japanese business association; Mitsubishi Heavy Industries America, Inc., a business association purporting to be a Delaware corporation, Defendants–Appellees.

Lester I. Tenny, Plaintiff–Appellant,

v.

Mitsui & Co. Ltd., a Japanese business association; Mitsui & Co (USA), Inc, a business association purporting to be a New York Corporation; Mitsui Mining Co Ltd, a Japanese business

association; Mitsui Mining USA Inc, a business association purporting to be a Delaware corp, Defendants–Appellees.

Shirley M. Rubenstein; Julia E. Stevenson; Glen Leroy, individually and on behalf of a class of persons similarly situated, Plaintiffs–Appellants,

v.

Ishihara Sangyo Kaisha, Ltd; Ishihara Corporation, a California corporation; ISK Americas, Inc., a Delaware corporation, Defendants–Appellees.

Raymond Heimbuch; Vivian O. Johnson; William R. Lowe; Sam P. Buse; Alfred Berest; Edwin F. Lindros; Michael Bibin; J.S. Gray; Karl William Holt; Norman R. Matthews; Darrel D. Stark; Carmel Zipeto, Plaintiffs–Appellants,

v.

Ishihara Sangyo Kaisha, Ltd, a Japanese business association; Ishihara Corporation; ISK Americas, Inc., a business association purporting to be a Delaware corporation, Defendants–Appellees.

Melody Solis, individually and on behalf of a class of persons similarly situated, Plaintiff–Appellant,

v.

Nippon Steel Corporation, a Japanese business association; Nippon Steel Trading Co., Ltd., a Japanese business association; Nippon Steel USA Inc, a business association purporting to be a New York corporation; Nippon Steel Trading America, Defendants–Appellees.

Harry Corre, Plaintiff–Appellant,

v.

Mitsui & Co. Ltd; Mitsui & Company (USA), Inc.; Mitsui Mining USA Inc; Mitsui Mining Co., Ltd., Defendants–Appellees.

Garth G. Dunn, Plaintiff–Appellant,

v.

Nippon Steel Corporation, a Japanese business association; Nippon Steel USA, a business association purporting to be a New York Corp., Defendants–Appellees,

and

Japan Iron & Steel, a Japanese business association; Yawata Iron & Steel, a Japanese business association; Fuji Iron & Steel, a Japanese business association; Mitsubishi Corporation, a Japanese business association; Mitsubishi Shoji; Sumitomo Corp.; Sumitomo Commercial Company, a Japanese business association, Defendants.

James O. King, Plaintiff–Appellant,

v.

Nippon Steel Corp; Nippon Steel USA, Defendants–Appellees.

Perfecto Llanza, on his own behalf and on behalf of all others similarly situated; Alberto Saldejeno; Acelopio Galedo; Generoso Jacob; Ernesto Santo Domingo; Imelda Santo Domingo, Plaintiffs–Appellants,

v.

Mitsui & Co (USA), Inc, a business association; Mitsui Mining Co., Ltd., a Japanese business association; Mitsubishi Corporation; Nippon Steel Corp, a Japanese business association; Nippon Steel USA Inc., Defendants–Appellees.

Alberto Saldajeno; Acelopio Galedo; Generoso Jacob, individually and on behalf of a class of persons similarly situated; Perfecto Llanza; Ernesto Santo Domingo; Imelda Santo Domingo, Plaintiffs–Appellants,

v.

Ishihara Sangyo Kaisha, Ltd, a Japanese business association; Ishihara Corporation (USA); Taiheiyo Cement, a Japanese business association; Onoda USA; Kreha Corporation of America, Inc.; Mitsui & Co. (USA); Showa Denko America, Inc.; Mitsui Mining USA Inc; Furukawa Electric North America, Inc.; Sumitomo Heavy Industries (USA); Nippon Steel USA Inc.; Mitsubishi International Corporation; Mitsubishi Materials USA Corporation; Mitsubishi Heavy Industries America, Inc., Defendants–Appellees.

Ernesto Santo Domingo, individually and on behalf of a class of persons similarly situated; Imelda Santo Domingo, individually and on behalf of a class of persons similarly situated, Plaintiffs–Appellants,

v.

Ishihara Sangyo Kaisha, Ltd, a Japanese corporation; Ishihara Corporation U.S.A., California corporation, Defendants–Appellees.

Manuel A. Eneriz; Dexter Eneriz, Executor of the Estate of Manuel A. Eneriz, Plaintiffs–Appellants,

v.

Mitsui & Company Ltd.; Mitsui & Company (USA), Inc.; Mitsui Mining Company, Ltd.; Mitsui Mining USA Inc, Defendants–Appellees.

Ralph Levenberg, on behalf of himself and all others similarly situated, Plaintiff–Appellant,

v.

Nippon Sharyo Ltd.; Nippon Sharyo USA., Inc., Defendants–Appellees.

Harold W. Poole; Ernest Loy; Francis W. Agnes; Robert C. Clark; Clarence S. Kellogg, Plaintiffs–Appellants,

v.

Nippon Steel Corp, a Japanese business association; Nippon Steel Trading Co., Ltd., a business association purporting to be a New York corporation; Nippon Steel Trading America, a business association purporting to be a California corporation, Defendants–Appellees.

Suk Yoon Kim, on behalf of himself and all others similarly situated, Plaintiff–Appellant,

v.

Ishikawajima Harima Heavy Industries Ltd.; IHI Inc.; Sumitomo Heavy Industries Ltd.; Sumitomo Heavy Industries (USA) Inc., Defendants–Appellees.

Zhenhuan Ma, Plaintiff–Appellant,

v.

Kajima Corporation; Kajima Construction Services, Inc.; Kajima Development Corporation; Kajima Engineering and Construction, Inc.; Kajima International, Inc.; Kajima U.S.A., Inc, Defendants–Appellees.

Sa Son Sin, Plaintiff–Appellant,

v.

Mitsui & Co, Ltd.; Mitsui & Co. (USA); Mitsui Engineering & Shipbuilding Co., Ltd.; Paceco Corporation, Defendants–Appellees.

Ruben Resus; Carlos Cadenilla, individually and on behalf of a class of persons similarly situated, Plaintiffs–Appellants,

v.

Mitsui & Co. Ltd., a Japanese business association; Mitsui Bussan Kaisha; Mitsui & Co (USA), Inc; Mitsubishi Corporation; Mitsubishi International Corporation, a business corporation; Mitsubishi Heavy Industries, Ltd., a Japanese business association; Mitsubishi Heavy Industries America Inc., a business association; Mitsubishi Materials Corporation, a Japanese association; Mitsubishi Materials USA Corporation, a business association; Sumitomo Corp., a Japanese business association; Sumitomo Corp. of America, a business association; Kureha Corporation of America, a business association; Furukawa Electric North America, Inc., a business association; Taiheiyo Cement, a Japanese business association; Onoda USA Inc., a business association; Showa Denko K K, a Japanese business association, Defendants–Appellees.

Shang Ting Sung, Plaintiff–Appellant,

v.

Mitsui & Co, Ltd.; Mitsui & Co. (USA); Mitsubishi Corporation; Mitsubishi International Corporation; Mitsui Mining Co., Ltd.; Mitsui Mining USA Inc, Defendants–Appellees.

Raymond Wheeler; Alec Charles Murphy; William Schmitt; Hendrick Zeeman; Tammerus Willem Carter Visscher; David Clarke; Willem Hendrik De Haan, Plaintiffs–Appellants,

v.

Mitsui & Co. Ltd, a Japanese business association; Mitsui & Company (USA), Inc., a business association; Mitsui Mining Company, Ltd., a Japanese business association; Mitsui Mining USA Inc; Nippon Steel USA; Mitsubishi Corporation, Mitsubishi International Corp.; Mitsubishi Heavy Industries America, Inc.; Mitsubishi Materials USA Corporation; Mitsubishi Heavy Industries, Ltd., Defendants–Appellees.

Jae Sik Choe, Plaintiff–Appellant,

v.

Nippon Steel Corporation; Mitsubishi Heavy Industries, Ltd., Defendants–Appellees.

Frank A. Mente; Neville J. Booker, individually and on behalf of persons similarly situated, Plaintiffs–Appellants,

v.

Mitsui & Co. Ltd, a Japanese association, aka/Mitsui Bussan Kaisha; Mitsui Mining Company, Ltd., a Japanese business association; Mitsui & Company (USA), Inc., a business association; Nippon Steel Corporation, a Japanese corporation; Nippon Steel USA Inc., a business association; Mitsubishi Corporation, a Japanese business association; Mitsubishi Materials USA Corporation; Mitsubishi Materials Corporation, a Japanese business association; Mitsubishi Heavy Industries, Ltd., a Japanese business association; Mitsubishi International Corporation, a business corporation, Defendants,

and

Mitsui Mining USA Inc, a business association; Mitsubishi Heavy Industries America Inc., a business association, Defendants–Appellees.

Aizhu Su, on behalf of himself and all others similarly situated; Chunsheng Tian, on behalf of himself and all others similarly situated, Plaintiffs–Appellants,

v.

Mitsubishi Corporation, a corporation; Mitsubishi Corporation, a corporation; Mitsui & Co., Ltd., a corporation; Mitsui Mining Company, Ltd., a corporation; Mitsui & Company (USA), Inc., a corporation; Mitsui Mining USA Inc, a corporation, Defendants–Appellees.

Do Geun Oh; Eung Chang Lee; Yong Hae Lee, individually and on behalf of a class of persons similarly situated, Plaintiffs–Appellants,

v.

Mitsui & Co., Ltd, a Japanese business association; Mitsui & Co. (USA), a business association; Mitsubishi Corporation, a Japanese business association; Mitsubishi Corporation, a business association; Mitsubishi Heavy Industries, Ltd., a Japanese business association; Mitsubishi Heavy Industries America, Inc., a business association; Mitsubishi Materials Corporation, a Japanese business association; Mitsubishi Materials USA Corporation, a business association; Nippon Steel Corp, a Japanese business association; Nippon Steel USA, a business association; Showa Denko America, Inc., a business association; Showa Kogyo, a Japanese business association, Defendants–Appellees.

Gloria Tyler Alfano; Madeline Felkins; Warren Carringer; Howard Friedman, Dr.; Richard Gordon, Maj.; Oakie Dent Pack, on behalf of themselves and all others similarly situated, Plaintiffs–Appellants,

v.

Mitsui & Company (USA), Inc.; Mitsui Mining Company, Ltd.; Mitsui Mining USA Inc; Mitsubishi Corporation, a corporation; Mitsubishi Corporation; Mitsubishi Heavy Industries America Inc., a Corporation; Mitsubishi Heavy Industries, Ltd., a corporation, Defendants–Appellees.

H. Joseph Terrence, aka Joseph E. Terfansky; Franklin D. Gross; Frederick M. Fullerton, Jr.; Erma L. Weimer, Plaintiffs–Appellants,

v.

Mitsui & CO., LTD., a Japanese business corporation aka Mitsui Bussan Kaisha; Mitsui & Company (USA), Inc., a business association; Mitsui Mining USA Inc, a business association; Mitsubishi Corporation, a Japanese business association; Mitsubishi Materials Corporation, a Japanese business association; Mitsubishi Heavy Industries, Ltd., a Japanese business association; Mitsubishi Materials USA Corporation, a business association; Mitsubishi Corporation, a business association; Mitsubishi Heavy Industries America, Inc., a business association, Defendants–Appellees.

Arthur Titherington; Henry George Blackham; Fergus Dunsmore McGhie, on behalf of themselves and others similarly situated, Plaintiffs–Appellants,

v.

Japan Energy Corp, a Japanese business association; Japan Energy USA, a Delware Corporation; Irvine Scientific Sales, a California Corporation, Defendants–Appellees.

Finnie B. Price, On behalf of himself and all others similarly situated, Plaintiff–Appellant,

v.

Mitsubishi Corporation; Mitsubishi Heavy Industries, Ltd., a corporation; Mitsubishi Heavy Industries America Inc.; Mitsubishi International Corporation, a corporation; Mitsui & Co (USA) Inc.; Mitsui & Co. Ltd., a corporation; Mitsui Mining Co Ltd; Mitsui Mining USA Inc, a corporation, Defendants–Appellees.

Nos. 00–56673, 01–17115, 01–17116, 01–17123, 01–17124, 01–17134, 01–17155, 01–17157, 01–17160, 01–17172, 01–17176, 01–17177, 01–17185, 01–17189, 01–17195, 01–17197, 01–17201, 01–17203, 01–17204, 01–17207, 01–17210, 01–17211, 01–17230, 01–17243, 01–17251, 01–17252, 01–17260, 01–17265, 01–17499.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 7, 2002.

Filed Jan. 21, 2003.

Amended March 6, 2003.

Nate G. Kraut, Law Offices of Nate G. Kraut, Los Angeles, CA, for plaintiff-appellant Josef Tibor Deutsch.

Joseph W. Cotchett, Bruce L. Simon and Steven N. Williams, Cotchett, Pitre, Simon & McCarthy, Burlingame, CA; Lourdes Santos Tancinco, Tancinco Law Offices, San Francisco, CA, for Saldajeno plaintiffs-appellants.

Michael E. Withey, Strittmatter, Kessler, Whelan, Withey, Coluccio, Seattle, WA, for Santa Domingo plaintiffs-appellants.

Robert A. Swift, Denis F. Shiels, Nadia Ezzelarab and Hilary E. Cohen, Kohn, Swift & Graf, Philadelphia, PA; Jon Van Dyke, Honolulu, HI; Scott W. Wellman, Scott R. Warren and Mitsuruku Ushida, Wellman & Warren LLP, Irvine, CA; Rodrigo C. Domingo, Domingo & Dizon, Mikati City, Phillippines; Edward D. Fagan, Fagan & Associates, Livingston, NJ; Michael Witti, Law Offices, Munchen, Germany; Henry Burstyner, Glennen, Burstyner & Co., Melbourne, Australia, for Resus, Kim, Wheeler, Mente and Terrence plaintiffs-appellants.

Steven M. Schneebaum, Esq., Patton Boggs, LLP, Washington DC; Ronald Kleinman, Esq., C. Allen Foster, Esq., Joe R. Reeder, Esq. and Jessica Valltos, Esq., Greenberg Traurig, LLP, Washington, DC; David S. Casey, Jr., Esq., Bonnie E. Kane, Esq. and Wendy M. Behan, Esq., Herman, Mathis, Casey, Kitchens & Gerel, LLP, San Diego, CA; Maury A. Herman, Esq., Leonard A. Davis, Esq. and David Fox, Esq., Herman, Mathis, Casey, Kitchens & Gerel, LLP, New Orleans, LA; James W. Kitchens, Herman, Mathis, Casey, Kitchens & Gerel, LLP, Jackson, MS; James W. Parkinson, Esq., Law Offices of James W. Parkinson, Palm Desert, CA; Michael Goldstein, Esq., Law Offices of Michael Goldstein, Cardiff, CA; Venus Soltan, Esq., Soltan & Associates, Costa Mesa, CA; Attorneys for Poole, Loy, Agnes, Clark and Kellogg, plaintiffs-appellants. Daniel C. Girard, Girard, Gibbs & De Bartolomeo, LLP, San Francisco, CA; Anthony K. Lee, San Francisco, CA, for King and Levenberg plaintiffs-appellants.

William S. Lerach, Eric A. Isaacson, Frank J. Janecek, Jr., Joseph D. Daley and Patrick W. Daniels, Milberg, Weiss, Bershad, Hynes & Lerach LLP, San Diego, CA; Michael Rubin and Linda Lye, Altshuler, Berzon, Nussbaum & Demain, San Francisco, CA; Kevin P. Roddy, Hagens Berman LLP, Los Angeles, CA; John J. Bartko, William I. Edlund and Robert H. Bunzel, Bartko, Zankel, Tarrant & Miller, San Francisco, CA; Albert H. Meyerhoff, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, Los Angeles, CA; Li Yang, Law Offices of Li Yang, New York, NY; Howard D. Finkelstein and Jeffrey R. Krinsk, Finkelstein & Krinsk, San Diego, CA; Jonathan W. Cuneo, The Cuneo Law Group, P.C., Washington, DC; Thomas L. Galloway, Galloway & Associates, Boulder, CO; David R. Scott and Neil Rothstein, Scott & Scott, LLC, Colchester, CT; Henry H. Rossbacher, Rossbacher & Associates, Los Angeles, CA; Attorneys for Kim plaintiffs-appellants. Steve W. Berman and Jeffrey T. Sprung, Hagens Berman LLP, Seattle, WA; Kevin P. Roddy, Hagens Berman LLP, Los Angeles, CA, for Titherington, Blackham and McGhie plaintiffs-appellants.

Peter I. Ostroff, Mark E. Haddad, Lee L. Auerbach, Ronald L. Steiner, Sarah J. Heidel, Sidley, Austin, Brown & Wood LLP, Los Angeles, CA, for defendants-appellees Nippon Sharyo Ltd. and Nippon Sharyo U.S.A., Inc.

John H. Beisner and John F. Niblock, O'Melveny & Meyers LLP, Washington D.C., for defendants-appellees Mitsubishi Materials Corporation and Mitsubishi Materials U.S.A. Corporation.

Arne D. Wagner, Morrison & Foerster LLP, for defendants-appellees Mitsubishi

Corporation and Mitsubishi International Corporation.

Matthew Digby, Bingham Dana LLP, for defendants-appellees Mitsui Mining Co., Ltd., Mitsui Mining U.S.A., Inc., Nippon Sharyo U.S.A., Inc., Taiheiyo Cement U.S.A., Inc., Japan Energy Corporation, Japan Energy U.S.A., Furukawa Electric North America, Inc., and Irvine Scientific Sales Co., Inc.

Sara D. Schotland, Cleary, Gottlieb, Steen & Hamilton, for defendant-appellee Showa Denko America, Inc.

Arthur W. Harrigan, Jr., Danielson, Harrigan & Tollefson, LLP, for defendants-appellees Mitsubishi Heavy Industries, Ltd. and Mitsubishi Heavy Industries America, Inc.

Neil A.F. Popovic, Heller, Ehrman, White & Mcauliffe, for defendant-appellee Showa Denko America, Inc.

Paul Doyle, Kelley, Drye & Warren LLP, for defendant-appellee Kreha Corporation of America.

Christopher Landau, Kirkland & Ellis, for defendant-appellee Sumitomo Heavy Industries (U.S.A.) and Sumitomo Heavy Industries, Ltd.

Douglas E. Mirell, Loeb & Loeb LLP, for defendants-appellees Taiheiyo Cement U.S.A., Inc., Furukawa Electric North America, Inc., Japan Energy Corporation, Japan Energy (U.S.A.), Inc. and Irvine Scientific Sales Co., Inc.

Junji Masuda, Masuda & Ejiri, for defendant-appellee Japan Energy Corporation, Japan Energy (U.S.A.), Inc., and Irvine Scientific Sales Co., Inc.

David M. Balabanian, Christopher B. Hockett, Thomas S. Hixson and J. Leah Castella, McCutchen, Doyle, Brown & Enersen, LLP, San Francisco, CA, for defendants-appellees Mitsui & Co., Ltd. and Mitsui & Co. (U.S.A.), Inc.

Barbara Croutch, Pillsbury Winthrop, LLP, Los Angeles, CA, for defendants-appellees Mitsubishi Heavy Industries America Inc. and Mitsubishi Heavy Industries, Ltd.

Nathan Lane III and Joseph A. Meckes, Squire, Sanders & Dempsey LLP, San Francisco, CA, for defendants-appellees Ishihara Corporation (U.S.A.), Ishihara Sangyo Kaisha, Ltd. and ISK Americas Incorporated.

Margaret K. Pfeiffer, Sullivan & Cromwell, Washington DC, for defendants-appellees Nippon Steel U.S.A., Inc., Nippon Steel Corporation, Nippon Steel Trading America, Inc. and Nippon Steel Trading Co., Ltd.

Bruce E.H. Johnson, Davis, Wright, Tremaine, for defendants-appellees Mitsubishi Heavy Industries, Ltd. and Mitsubishi Heavy Industries America, Inc.

A. Victor Antola, Latham & Watkins, for defendants-appellees Kajima U.S.A., Inc., Kajima International, Inc., Kajima Engineering and Construction, Inc., Kajima Development Corporation and Kajima Construction Services, Inc.

Lloyd W. Aubry, Jr., Morrison & Foerster, LLP, for defendants-appellees Ishikawajima–Harima Heavy Industries Co., Ltd. and IHI, Inc.

Cynthia S. Papsdorf and Sheri M. Schwartz, Kelley Drye & Warren LLP, Los Angeles, CA; Bud G. Holman, Esq., Kelley Drye & Warren LLP, New York, NY, for defendants-appellees The Turner Corporation and Kitchell Corporation.

Catherine Z. Ysrael, Supervising Deputy Attorney General, State of California; Bill Lockyer, Attorney General of California; Manuel M. Medeiros, Solicitor General of California; Richard M. Frank, Chief Assistant Attorney General; Louis Verdugo, Jr. and Angela Sierra; For the State of Cali-

**702**

fornia as amicus curiae in support of plaintiff-appellants.

Douglas Hallward–Driemeier, Department of Justice, Civil Division, appellate Staff; Robert D. McCallum, Assistant Attorney General; John S. Gordon, United States Attorney; David W. Shapiro, United States Attorney; Mark B. Stern, Civil Division, appellate Staff; James G. Hergen and Lara A. Ballard, Department of State, Office of the Legal Adviser; For the United States as amicus curiae in support of defendants-appellees.

### ORDER

The opinion filed January .21, 2003 is hereby amended as follows:

1. Slip op. at 991, second full paragraph, line 6, after "because a state is," insert "generally."

2. Slip op. at 991, replace the last sentence (beginning "Because section 354.6 is substantive law"), including footnote 4, with the following:

 Nevertheless, that distinction does not affect the outcome here. Our determination of the foreign affairs doctrine issue does not depend on our conclusion that section 354.6 is substantive law. Whether substantive or procedural, section 354.6 creates a special rule that applies only to a newly defined class of tort actions—actions brought by Second World War slave labor victims against the entities that enslaved them. This new rule profoundly alters the likelihood that such actions will succeed, by not only extending the statute of limitations for claims that were timely when the statute took effect (although we doubt that any such claims existed), but, far more important, by reviving claims that were already time-barred. In the latter instance, the statute upset the repose of potential defendants. Such a revival of liability—even civil liability—is troubling and raises serious due process questions. We need not address those questions here, however. The important point for our foreign affairs analysis is that the California legislature created—or at least resurrected—a special class of tort actions, with the aim of rectifying wartime wrongs committed by our enemies or by parties operating under our enemies' protection.

3. Immediately following the passage inserted above (after "under our enemies' protection") add a new footnote containing the following text:

Two decisions of the California Court of Appeal, one by the Second Appellate District and one by the Fourth, have recently addressed whether section 354.6 is substantive or procedural in nature. The decisions reached opposite conclusions. *Compare Mitsubishi Materials Corp. v. Superior Court,* 130 Cal.Rptr.2d 734, 2003 WL 253877, slip op. at 2 (Cal.Ct.App.2003) ("The legislation actually *creates* a state law claim which otherwise would not exist . . . .") *with Taiheiyo Cement Corp. v. Superior Court,* 129 Cal. Rptr.2d 451, 2003 WL 124284, slip op. at 24 (Cal.Ct.App.2003) ("The sole purpose of section 354.6 is to extend the statute of limitations for common law claims for unpaid labor and. personal injuries arising out of slave or forced labor."). Both decisions were issued after our opinion was sent to the Clerk for filing.

4. Slip op. at 1005, replace the first full paragraph with the following:

Section 354.6 runs afoul of the restriction on the exercise of foreign affairs powers by the states. Because California lacks the power to create a right of action—or, alternatively, to resurrect time-barred claims—in order to provide its own remedy for war-related injuries inflicted by our former enemies and those who operated in their territories, we hold that section 354.6 is unconstitutional.

With these amendments, the panel has voted unanimously to deny the petitions for rehearing and rehearing en banc. The full court has been advised of the petitions for rehearing en banc, and no active judge has requested a vote on whether to rehear

the matter en banc. Fed. R.App. P. 35. The petitions for rehearing and rehearing en banc are denied.

The mandate will be held pending a decision in· *American Insurance Association v. Garamendi,* —— U.S. ——, 123 S.Ct. 817, 154 L.Ed.2d 768 (2003) (No. 02–722) (granting certiorari).

## OPINION

REINHARDT, Circuit Judge.

Plaintiffs–Appellants in these consolidated cases allege that they were forced to work as slave laborers for German and Japanese corporations during the Second World War. They seek damages and other remedies for lost wages and for other atrocious injuries they suffered in the course of their forced labor. Defendants–Appellees are corporations (or successors or affiliates of those corporations) that allegedly committed these atrocities.

A California statute passed in 1999 creates a cause of action against such defendants for claims involving Second World War slave labor.[1] Cal.Code Civ. Proc. § 354.6. Under the statute, these claims are not time-barred if commenced on or before December 31, 2010. *Id.* Although Appellants assert a variety of statutory and common law claims for relief, all raise section 354.6 as the primary basis for bringing their suits so many years after the alleged wrongs were committed. Reluctantly, we hold that section 354.6 is invalid under the United States Constitution and that in its absence Appellants' remaining claims are time-barred.

## Background

These cases concern the terrible abuses that German and Japanese corporate interests inflicted both on civilians and on

---

**1.** Although the statute distinguishes between "slave laborers," *see* Cal.Code Civ. Proc. § 354.6(a)(1), and "forced laborers," *see* § 354.6(a)(2), the distinction is generally im-

material to the analysis in this opinion. We generally use the term "slave laborer" to refer to both categories of workers.

soldiers captured by German and Japanese military forces during the Second World War. The corporations and their managers, with the cooperation and encouragement of their governments, subjected many individuals to vicious cruelties and forced them to work long hours without pay. The slave workers were often underfed, physically beaten, exposed to dangerous conditions, and denied medical care; many were murdered, and others died as a result of the maltreatment they suffered. Among these slave laborers were, tragically, many who became victims of the Holocaust, the most atrocious act ever perpetrated by a civilized (or uncivilized) people, an act unparalleled in history. Indeed, the Holocaust represents the worst historic manifestation of the perpetual human condition known as antisemitism, a phenomenon that is still thriving in all too many parts of the world today.[2]

## I. The Cases

### A. *Deutsch v. Turner*

The suit by Appellant Josef Tibor Deutsch ("Deutsch") is the only action before us concerning wrongs committed by German rather than Japanese corporations and the only action that was not consolidated with other cases by the district court. It is, in other words, the only Holocaust case at issue here, and it, unlike most of the Japanese cases, involves only a single plaintiff.

Currently a resident of California, Deutsch, a Jew, was born and raised in Hungary. Deutsch asserts that, in 1944, when he was a child, the Nazis took over his town and transported him and his brother Georg to Auschwitz. There the brothers were tortured and forced to work as slaves for 14–hour days, seven days a week. Their work was for the benefit of private corporations, which entered into agreements with the Nazi government, whereby they paid the Nazis less than the prevailing wage for the work of the slaves. The corporations for which the Deutsch children labored included Appellee Hochtief AG ("Hochtief"), one of Germany's largest and oldest construction companies. A civilian employee of Hochtief overseeing the slave laborers in their work for Hochtief beat Deutsch's brother Georg. Georg ultimately died from his injuries. By a stroke of good fortune, Deutsch, unlike most of his co-religionists, survived.

On April 7, 2000, Deutsch filed a complaint in the Superior Court of California against Hochtief, its wholly owned subsidiary the Turner Corporation, a Delaware corporation, and the Kitchell Corporation, an Arizona corporation that Hochtief owns in part. Deutsch alleged intentional infliction of emotional distress, unlawful business practices under the California Business and Professions Code, quantum meruit, and wrongful death. The action was removed to federal court on the ground of diversity jurisdiction.

Deutsch's basis for bringing the action so long after the alleged acts is section 354.6 of the California Code of Civil Proce-

---

**2.** It is plainly Holocaust survivors who are the intended beneficiaries of section 354.6, which speaks of "concentration camp[s]" and "ghettos[s]," mentions no power by name other than the "Nazi regime," and never employs the term "Axis Powers," which is the usual collective term for the enemies of the Allied Powers. Ironically, among the hundreds of thousands of plaintiffs in the cases before us, there is only one Holocaust survivor. All the other plaintiffs suffered their injuries in Asia at the hands of Japanese companies. Whatever the intended purpose of the California statute, the text of section 354.6 appears to be broad enough to encompass all the plaintiffs' claims, and not just those of the one Holocaust survivor. We follow the district court and all the parties before us in assuming that such is the case.

dure, which confers jurisdiction on the Superior Court to hear claims by "[a]ny Second World War slave labor victim" or "Second World War forced labor victim," or their heirs, against "any entity or successor in interest thereof, for whom that labor was performed, either directly or through a subsidiary or affiliate." Cal. Code Civ. Proc. § 354.6(b). Section 354.6 permits such actions to be brought on or before December 31, 2010, regardless of any otherwise applicable statute of limitations. § 354.6(c).

The district court dismissed the action as presenting a nonjusticiable political question. *Deutsch v. Turner*, 2000 WL 33957691 (C.D.Cal.2000).

### B. *In re World War II Era Japanese Forced Labor Litigation*

The consolidated appeal before us also involves 28 other suits, all by victims and heirs of victims against Japanese business entities. Some were brought as class actions. Because there are so many complaints, and because the precise factual allegations do not bear on our decision, we do not here recount the details of the injuries that the various Appellants endured. Unlike Deutsch, these individuals—some civilians, some soldiers who were prisoners of war—were not selected because of their religious affiliation and were not victims of an overall plan to exterminate an ethnic or religious group. Rather, they became subject to the Japanese slave labor program either because they opposed the Japanese war efforts, in one capacity or another, or simply because they were in the wrong place at the wrong time. In any event, they were all subjected to serious mistreatment, including starvation, beatings, physical and mental torture, being transported in unventilated

cargo holds of ships, and being forced to make long marches under a tropical sun without water. Some survived, while others were ultimately executed, or died from disease or physical abuse.

Twenty-seven of the suits against the Japanese corporate interests were originally brought in California Superior Court, while one was initiated in the United States District Court for the Central District of California. The claimants demanded damages and other relief, raising claims under California Code of Civil Procedure section 354.6, and alleging, variously, assault and battery, unjust enrichment, conspiracy, false imprisonment, intentional infliction of emotional distress, conversion, quantum meruit, unfair business practices under California Business and Professions Code sections 17200 *et seq.*, involuntary servitude under California Penal Code section 181 and Article I, § 6 of the California Constitution, and violations of international law under the Alien Tort Claims Act, 28 U.S.C. § 1350. As defendants they name both Japanese corporations that they allege committed the injuries and successors and affiliates of those corporations. The suits filed in state court were removed to federal court; all were then consolidated in the Northern District of California. The district court denied motions to remand and dismissed all claims.

Appellants in the majority of the Japanese cases were, at the time of the occurrences that form the basis for these lawsuits, nationals of the United States or of other Allied nations. Many were in military service and were taken as prisoners of war. The district judge dismissed these cases on the ground that they were barred by a provision of the Treaty of Peace ending the war between the Allied Powers and Japan.[3] *In re World War II Era*

---

**3.** The provision that had this effect is Article 14(b), which provides as follows:

*Japanese Forced Labor Litig.*, 114 F.Supp.2d 939, 944–49 (N.D.Cal.2000) (*Forced Labor (Allied I)*); *In re World War II Era Japanese Forced Labor Litig.*, No. MDL–1347 (N.D.Cal. Feb. 8, 2001) (*Forced Labor (Allied II)*); *In re World War II Era Japanese Forced Labor Litig.*, 164 F.Supp.2d 1153, 1157 (N.D.Cal.2001) (*Forced Labor (Filipinos)*).

Appellants in the remaining cases were Korean and Chinese nationals. The district court held that their claims were not affected by the Treaty of Peace between the Allies and Japan, because these claimants were not Allied nationals or nationals of any signatory of that treaty. *In re World War II Era Japanese Forced Labor Litig.*, 164 F.Supp.2d 1160, 1165–68 (N.D.Cal.2001) (*Forced Labor (Koreans)*). The court dismissed these cases nonetheless, on the grounds that section 354.6 was an unconstitutional intrusion on the foreign affairs powers of the United States, and that the remaining claims were time-barred. *Id.* at 1168–78.

## II. Constitutionality of Section 354.6 Under Foreign Affairs Doctrine

### A. Section 354.6 and Its Effect

All Appellants rely on section 354.6 of the California Code of Civil Procedure. Because it can best be understood when read as a whole, we quote it in full:

§ 354.6.

 (a) As used in this section:

> Except as otherwise provided in the present Treaty, the Allied Powers waive all reparations claims of the Allied Powers, other claims of the Allied Powers and their nationals arising out of any actions taken by Japan and its nationals in the course of the prosecution of the war, and claims of the Allied Powers for direct military costs of occupation.

 (1) "Second World War slave labor victim" means any person taken from a concentration camp or ghetto or diverted from transportation to a concentration camp or from a ghetto to perform labor without pay for any period of time between 1929 and 1945, by the Nazi regime, its allies and sympathizers, or enterprises transacting business in any of the areas occupied by or under control of the Nazi regime or its allies and sympathizers.

 (2) "Second World War forced labor victim" means any person who was a member of the civilian population conquered by the Nazi regime, its allies or sympathizers, or prisoner-of-war of the Nazi regime, its allies or sympathizers, forced to perform labor without pay for any period of time between 1929 and 1945, by the Nazi regime, its allies and sympathizers, or enterprises transacting business in any of the areas occupied by or under control of the Nazi regime or its allies and sympathizers.

 (3) "Compensation" means the present value of wages and benefits that individuals should have been paid and damages for injuries sustained in connection with the labor performed. Present value shall be calculated on the basis of the market value of the services at the time they were performed, plus interest from the time the services were performed, compounded annually to date of full pay-

> Treaty of Peace with Japan, Sept. 8, 1951, art. 14(b), 3 U.S.T. 3169, T.I.A.S. No. 2490. The district court held that claims by Allied nationals against Japanese corporations were barred under the clause waiving "other claims of the Allied Powers and their nationals arising out of any actions taken by Japan and its nationals in the course of the prosecution of the war." *Forced Labor (Allied I)*, 114 F.Supp.2d at 944–49 (N.D.Cal.2000).

ment without diminution for wartime or postwar currency devaluation.

(b) Any Second World War slave labor victim, or heir of a Second World War slave labor victim, Second World War forced labor victim, or heir of a Second World War forced labor victim, may bring an action to recover compensation for labor performed as a Second World War slave labor victim or Second World War forced labor victim from any entity or successor in interest thereof, for whom that labor was performed, either directly or through a subsidiary or affiliate. That action may be brought in a superior court of this state, which court shall have jurisdiction over that action until its completion or resolution.

(c) Any action brought under this section shall not be dismissed for failure to comply with the applicable statute of limitation, if the action is commenced on or before December 31, 2010.

Appellants and the State of California as amicus seek to characterize section 354.6 as a purely procedural measure by reducing its scope to the provision regarding the limitations, as set forth in subsection (c). The entire effect of section 354.6, they argue, is to extend the statute of limitations for claims that are already available to remedy Nazi-era slave labor. They cite an impressive range of possible sources of substantive law prohibiting slave labor, including state statutes and common law, the United States Constitution, and international law. The reference in subsection (c) to "the applicable statute of limitations" supports their interpretation: If a statute of limitations is already "applicable," perhaps it is because subsection (c) contemplates a pre-existing cause of action, rather than a cause of action created under section 354.6.

■ However, section 354.6 can be viewed as purely procedural only when subsection (c) is viewed in isolation from the rest of the provision. Most important, the first sentence of subsection (b) explicitly creates a cause of action by providing that certain individuals "may bring an action" for certain wrongs. *See Verizon Md. Inc. v. Pub. Serv. Comm'n,* 535 U.S. 635, 122 S.Ct. 1753, 1759, 152 L.Ed.2d 871 (2002) (noting that language in a statute providing that party "may bring an action" "reads like the conferral of a private right of action"). Appellants' recitation of pre-existing causes of action for slave labor, whether under other statutes or other bodies of law, is therefore fruitless. Regardless of any pre-existing law, the California legislature chose to create a specific cause of action for persons subjected to slave labor by the Nazis and their allies and sympathizers. If confirmation of this reading is required, it is found in those passages of section 354.6 that set forth the details of the new cause of action. The section defines the class of plaintiffs who may sue under that cause of action, *see* § 354.6(a)(1), (2), sets the method for measuring damages, *see* § 354.6(a)(3), and establishes a special rule regarding liability of corporations affiliated with the wrong-doer, *see* § 354.6(b). Even the language of the statute of limitations provision itself limits the application of the statute of limitations to "action[s] brought under this section," thus confirming that section 354.6 creates a cause of action.

■ Appellants' only remaining argument for the procedural nature of section 354.6 is its placement within the Code of Civil Procedure, in Title Two: Time of Commencing Civil Actions. However, where the meaning of a statutory provision is clear, we do not rely upon the location the legislature chose for it in its system of codification, *see Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.,* 111 F.3d

1322, 1328 (7th Cir.1997), just as we do not rely upon the headings and titles of sections in such circumstances. *Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R.*, 331 U.S. 519, 528–29, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947). The reason for the placement of section 354.6 within the procedural code is, in any event, not difficult to explain: The most striking aspect of the section is, indeed, its statute of limitations, which would allow the commencement of a suit more than 60 years after the occurrence of the injury. *Id.* Section 354.6's placement, therefore, does not change our view that the section is substantive in nature.

The parties debate whether section 354.6 is substantive or procedural primarily in the context of the Appellees' due process challenge, which we do not address. The substantive nature of the provision, however, is relevant also to the foreign affairs doctrine analysis in which we engage below, because a state is generally more likely to exceed the limits of its power when it seeks to alter or create rights and obligations than when it seeks merely to further enforcement of already existing rights and duties. Nevertheless, that distinction does not affect the outcome here. Our determination of the foreign affairs doctrine issue does not depend on our conclusion that section 354.6 is substantive law. Whether substantive or procedural, section 354.6 creates a special rule that applies only to a newly defined class

of tort actions—actions brought by Second World War slave labor victims against the entities that enslaved them. This new rule profoundly alters the likelihood that such actions will succeed, by not only extending the statute of limitations for claims that were timely when the statute took effect (although we doubt that any such claims existed), but, far more important, by reviving claims that were already time-barred. In the latter instance, the statute upset the repose of potential defendants. Such a revival of liability—even civil liability—is troubling and raises serious due process questions. We need not address those questions here, however. The important point for our foreign affairs analysis is that the California legislature created—or at least resurrected—a special class of tort actions, with the aim of rectifying wartime wrongs committed by our enemies or by parties operating under our enemies' protection.[4]

## B. Foreign Affairs Doctrine Analysis

■ Appellees argue that section 354.6 exceeds California's power to engage in foreign affairs. We agree.[5]

The Constitution does not create an express, general power over foreign affairs but rather allocates particular powers related to foreign affairs to particular federal actors. It appoints the President as "Commander in Chief of the Army and Navy of the United States," U.S. Const.,

---

4. Two decisions of the California Court of Appeal, one by the Second Appellate District and one by the Fourth, have recently addressed whether section 354.6 is substantive or procedural in nature. The decisions reached opposite conclusions. *Compare Mitsubishi Materials Corp. v. Superior Court,* 130 Cal.Rptr.2d 734, 2003 WL 253877, slip op. at 2 (Cal.Ct.App.2003) ("The legislation actually *creates* a state law claim which otherwise would not exist ....") *with Taiheiyo Cement Corp. v. Superior Court,* 129 Cal.Rptr.2d 451,

2003 WL 124284, slip op. at 24 (Cal.Ct.App. 2003) ("The sole purpose of section 354.6 is to extend the statute of limitations for common law claims for unpaid labor and personal injuries arising out of slave or forced labor."). Both decisions were issued after our opinion was sent to the Clerk for filing.

5. Some Appellants assert that federal jurisdiction is lacking over their claims. We address that issue below.

art. II, § 2, cl. 1, and authorizes him to "make Treaties, provided two thirds of the Senators present concur," to "appoint Ambassadors" with the "Advice and Consent of the Senate," *id.* cl. 2, and to "receive Ambassadors and other public Ministers," *id.* § 3. It grants to Congress the power to "lay and collect ... Duties, Imposts, and Excises," to "provide for the common Defence," *id.* art. I, § 8, cl. 1, to "regulate Commerce with foreign Nations," *id.* art. I, § 8, cl. 3, to "establish an uniform Rule of Naturalization," *id.* cl. 4, to "define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations," *id.* cl. 10, to "declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water," *id.* cl. 11, to "raise and support Armies," *id.* cl. 12, to "provide and maintain a Navy," *id.* cl. 13, and to regulate "the land and naval forces," *id.* cl. 14.

While the Constitution allocates these foreign affairs powers specifically to the federal government, it also expressly prohibits the states from exercising certain foreign relations powers, including both some of those expressly allocated to the federal government and a few others. "No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal" or, without consent of Congress, "lay any Imposts or Duties on Imports or Exports," "keep Troops or Ships of War in time of Peace," "enter into any Agreement or Compact ... with a foreign Power," or "engage in War, unless actually invaded." *Id.* § 10.

Because the Constitution mentions no general foreign affairs power, and because only a few specified powers related to for-

eign affairs are expressly denied the states, one might assume that, with certain exceptions, states are free to pursue their own foreign policies. This is not, however, the case. To the contrary, the Supreme Court has long viewed the foreign affairs powers specified in the text of the Constitution as reflections of a generally applicable constitutional principle that power over foreign affairs is reserved to the federal government. The Court has sometimes expressed this principle in expansive terms, declaring, for example, that "[p]ower over external affairs is not shared by the States; it is vested in the national government exclusively." *United States v. Pink*, 315 U.S. 203, 233, 62 S.Ct. 552, 86 L.Ed. 796 (1942); *see also Chae Chan Ping v. United States*, 130 U.S. 581, 606, 9 S.Ct. 623, 32 L.Ed. 1068 (1889) (*The Chinese Exclusion Case*) ("For local interests the several States of the Union exist, but for national purposes, embracing our relations with foreign nations, we are but one people, one nation, one power.").

The implication of the general principle is that "even in [the] absence of a treaty" or federal statute, a state may violate the constitution by "establish[ing] its own foreign policy." *Zschernig v. Miller*, 389 U.S. 429, 441, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968).[6] *Zschernig* concerned an Oregon statute that provided for escheat of estate property claimed by a nonresident alien unless United States citizens had reciprocal rights in the country of the alien's residence and foreign heirs in that country would have the right to receive the proceeds of Oregon estates without confiscation. *Id.* at 430–31, 88 S.Ct. 664. The Court held that, while a reciprocity statute

---

6. The doctrine has been referred to as "dormant foreign affairs preemption," or simply as "the foreign affairs power." *See Gerling Global Reinsurance Corp. of Am. v. Low*, 240 F.3d 739, 751 n. 9 (9th Cir.2001) (internal quotation marks removed), *cert. granted sub nom. Am. Ins. Ass'n v. Low*, 71 U.S.L.W. 3373 (2003).

of this sort was not facially invalid, probate courts applying it impermissibly relied on inquiries into the type of governments that obtain in particular foreign nations—whether aliens under their law have enforceable rights, whether the so-called "rights" are merely dispensations turning upon the whim or caprice of government officials, whether the representation of consuls, ambassadors, and other representatives of foreign nations is credible or made in good faith, whether there is in the actual administration in the particular foreign system of law any element of confiscation.

*Id.* at 434, 88 S.Ct. 664. In short, the Court found that the application of the statute depended less on an evaluation of the stated law of a particular country than on whether that country's political system was legitimate in the view of the Oregon courts. *See id.* at 440, 88 S.Ct. 664 (noting that state courts had held that communist and fascist countries did not grant rights reciprocal to those of Oregonians). To condition the application of state law on the political system of a foreign country was "an intrusion by the State into the field of foreign affairs which the Constitution entrusts to the President and the Congress." *Id.* at 432, 88 S.Ct. 664.

Despite the broad language of *Pink* and the *Chinese Exclusion Case*, however, *Zschernig* is "[t]he only case in which the Supreme Court has struck down a state statute as violative of the foreign affairs power." *Int'l Ass'n of Indep. Tanker Owners v. Locke,* 148 F.3d 1053, 1069 (9th Cir.1998), *rev'd in part on other grounds*

*sub nom. United States v. Locke,* 529 U.S. 89, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000). *Zschernig* has been applied sparingly, because the Supreme Court has held that a statute does not violate the constitution where it merely has "some incidental or indirect effect in foreign countries." *Clark v. Allen,* 331 U.S. 503, 517, 67 S.Ct. 1431, 91 L.Ed. 1633 (1947) (upholding facially a statute similar to that subsequently struck as applied in *Zschernig* ).[7]

Noting that "the federal government's foreign affairs power .... is rarely invoked by the courts," we have declined to invalidate under *Zschernig* a California statute with certain superficial similarities to section 354.6. *Gerling Global Reinsurance Corp. of Am. v. Low,* 240 F.3d 739, 752 (9th Cir.2001), *cert. granted sub nom. Am. Ins. Ass'n v. Low,* 71 U.S.L.W. 3373 (2003). *Gerling* concerned California's Holocaust Victim Insurance Relief Act, Cal. Ins.Code §§ 13800–13807 ("HVIRA"), which requires insurers doing business in California to file certain information about any insurance policies that they or companies "related" to them sold in Europe and that were in effect between 1920 and 1945. *Id.; see Gerling,* 240 F.3d at 743, 753. While recognizing that HVIRA involved foreign affairs, we held that it was constitutional because of the combination of two factors: first, "HVIRA, on its face, involves commerce alone"—and thus should be considered under the Supreme Court's foreign commerce cases rather than under the foreign affairs cases; and second, HVIRA "is not, on its face, directed at any particular foreign country"—and thus is

---

**7.** Other courts have, however, invalidated statutes under foreign affairs doctrine. *See, e.g., Nat'l Foreign Trade Council v. Natsios,* 181 F.3d 38, 49–61 (1st Cir.1999) (invalidating Massachusetts law restricting ability of Massachusetts and its agencies to purchase goods or services from individuals or companies engaged in business with Burma), *aff'd*

on other grounds sub nom. *Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000); *Springfield Rare Coin Galleries, Inc. v. Johnson,* 115 Ill.2d 221, 236–37, 104 Ill.Dec. 743, 503 N.E.2d 300 (1986) (invalidating state statute excluding South African coins from otherwise generally applicable state tax exemptions).

comparatively unlikely to interfere with the foreign relations of the federal government. *Id.* at 753.

While *Gerling* shows that the general prohibition against state involvement with external affairs is not as broad as some judicial statements would imply, it also suggests a mode of analysis that is relevant to the cases before us. In particular, *Gerling* distinguishes among statutes according to the foreign affairs functions that they implicate. *Gerling* suggests that statutes that "mainly involve foreign commerce" are among those least likely to be held invalid under the foreign affairs power. *Id.* The regulation of commerce is simply not central to the foreign affairs power that is off limits to states.[8] For present purposes, we must consider the importance to foreign affairs analysis of another subset of foreign affairs powers: the power of the federal government to make and to resolve war, including the power to establish the procedure for resolving war claims.

■ [3] While neither the Constitution nor the courts have defined the precise scope of the foreign relations power that is denied to the states, it is clear that matters concerning war are part of the inner core of this power. Of the eleven clauses of the Constitution granting foreign affairs powers to the President and Congress, *see* *supra*, seven concern preparing for war, declaring war, waging war, or settling war.[9] Most of the Constitution's express limitations on states' foreign affairs powers also concern war.[10] Even those foreign affairs powers in the Constitution that do not expressly concern war and its resolution may be understood, in part, as a design to *prevent* war. Indeed, as the *Federalist* shows, supporters of the new Constitution believed that disunity in international affairs risked unnecessary war. *See, e.g.,* THE FEDERALIST, NO. 3, at 13 (Clinton Rossiter ed., 1961) ("[F]ewer just causes of war will be given by the national government, [and] it will also be more in their power to accommodate and settle them amicably."). The Supreme Court cases under the foreign affairs power have also been driven, in part, by this concern. Thus the inheritance provision at issue in *Zschernig,* although superficially unrelated to war, was seen by a Court operating at the height of the Cold War as a potential provocation to foreign powers. " 'Experience has shown,' " the Court wrote in striking the provision, " 'that international controversies of the gravest moment, sometimes even leading to war, may arise from real or imagined wrongs to another's subjects inflicted, or permitted, by a government.' " 389 U.S. at 441, 88 S.Ct. 664 (quoting *Hines v. Davidowitz,* 312 U.S. 52, 64, 61 S.Ct. 399, 85 L.Ed. 581 (1941)).

**8.** State regulation of foreign commerce might, however, exceed constitutional limitations under other constitutional doctrines. *See, e.g., Barclays Bank PLC v. Franchise Tax Bd.,* 512 U.S. 298, 328, 114 S.Ct. 2268, 129 L.Ed.2d 244 (1994) (considering whether state's international tax reporting system violated either dormant commerce clause or federal government's ability to speak in "one voice.")

**9.** *See* U.S. Const., art. II, § 2, cl. 1 (making President Commander in Chief); *id.* cl. 2; (authorizing President to make treaties with advice and consent of Senate); *id.* art. I, § 8, cl. 1 (authorizing Congress to "provide for the common Defence"); *id.* cl. 11 (authorizing Congress to declare war); *id.* cl. 12 (authorizing Congress to raise and support armies); *id.* cl. 13 (authorizing Congress to "provide and maintain a Navy"); *id.* cl. 14 (authorizing Congress to regulate "the land and naval forces").

**10.** *See id.* § 10 (prohibiting states from entering "any Treaty, Alliance, or Confederation," or, without congressional authorization, from "keep[ing] Troops or Ships of War in time of Peace" and from "engag[ing] in War, unless actually invaded.")

Matters related to war are for the federal government alone to address.

Among the six district court decisions we review here, the only one to reach the foreign affairs challenge to section 354.6 held that the provision was unconstitutional under that doctrine for six reasons:

(1) the terms of section 354.6 and its legislative history demonstrate a purpose to influence foreign affairs directly, (2) the statute targets particular countries, (3) the statute does not regulate an area that Congress has expressly delegated to states to regulate, (4) the statute establishes a judicial forum for negative commentary about the Japanese government and Japanese companies, (5) the Japanese government asserts that litigation of these claims could complicate and impede diplomatic relationships of the countries involved, and (6) the United States, through the State Department, contends that section 354.6 impermissibly intrudes upon the foreign affairs power of the federal government.

*Forced Labor (Koreans)*, 164 F.Supp.2d at 1173. Although we agree that section 354.6 violates the foreign affairs power, we base our holding on a narrower consideration. We hold that section 354.6 is impermissible because it intrudes on the federal government's exclusive power to make and resolve war, including the procedure for resolving war claims.

With section 354.6, California seeks to redress wrongs committed in the course of the Second World War. By its terms, only "Second World War slave labor victims" and "Second World War forced labor victims" can bring suit under the provision. § 354.6(b). The wrong-doers under the statute—the enslaving individuals or entities—include "the Nazi regime, its allies and sympathizers, or enterprises transacting business in any of the areas occupied by or under control of the Nazi regime or

its allies or sympathizers." § 354.6(a)(1), (2). The governmental entities are, by definition, wartime enemies of the United States, while the "enterprises" identified in the provision, if not themselves our wartime enemies, were operating in enemy territory and presumably—no party disputes this—with the consent and for the benefit of our wartime enemy. Wrongs committed after the end of the war are not cognizable under section 354.6; the provision concerns only acts that took place during the years leading up to the war and during the years of the war itself. *Id.* In short, California has sought to create its own resolution to a major issue arising out of the war—a remedy for wartime acts that California's legislature believed had never been fairly resolved.

■ The United States has already exercised its own exclusive authority to resolve the war, including claims arising out of it. It did not choose, however, to incorporate into that resolution a private right of action against our wartime enemies or their nationals. The United States resolved the war against Germany by becoming a party to a number of treaties and international agreements, beginning with the 1945 agreements at Yalta and Potsdam, in which the United States, Britain, and the Soviet Union agreed to extract reparations from Germany and its nationals but did not include a private right of action against either. *See* Protocol of the Proceedings, Berlin (Potsdam) Conference, Aug. 2, 1945, art. (B)(111), 3 Bevans 1207. Subsequent agreements also failed to create a private right of action, including the Paris Reparations Treaty of 1946 between the United States and 17 other nations, Agreement on Reparations From Germany, Jan. 14, 1946, 61 Stat. 3157, T.I.A.S. 1655 ("Paris Reparations Treaty"); the Transition Agreement of 1952 between the Western Powers and

the Federal Republic of Germany, Convention Between the United Kingdom of Great Britain and Northern Ireland, France, the United States of America and the Federal Republic of Germany on the Settlement of Matters Arising Out of the War and the Occupation, May 26, 1952 (as amended by Schedule IV to the Protocol on the Termination of the Occupation Regime in the Federal Republic of Germany, Oct. 23, 1954), 6 U.S.T. 4117, 331 U.N.T.S. 219; the London Debt Agreement of 1953 between the United States and 20 other nations, Agreement on German External Debts, Feb. 27, 1953, 4 U.S.T. 443, 333 U.N.T.S. 3; and the Two–Plus–Four Treaty, which reunified Germany and became effective on March 15, 1991, Treaty on the Final Settlement with Respect to Germany, Sept. 12, 1990, 29 I.L.M. 1186.[11] Most recently, the Foundation Agreement of July 17, 2000, an executive agreement between the governments of Germany and the United States, provided a limited form of remedy for claimants such as Deutsch. Agreement Between the Government of the United States of America and the Government of the Federal Republic of Germany Concerning the Foundation "Remembrance, Responsibility and the Future." The Foundation was created by

Germany, in negotiation with the United States, five Central and Eastern European countries, Israel, and the non-governmental Conference on Jewish Material Claims Against Germany, for the purpose of making payments to people who suffered at the hands of German companies during the Nazi Era. It provides for payment of up to 15,000 German Marks (roughly $7500) to individual claimants who were subjected to forced labor. *See id.* at Annex A. We do not have the authority to consider the adequacy of such payments here. Indeed, we acknowledge that no possible compensation could be sufficient to remedy the harm done to Holocaust victims and their families.

No party argues that any of these agreements provides the authority for a state of the United States to create a private right of action enabling individuals to recover for wartime injuries against German corporations. Deutsch argues, however, that the terms of these various agreements do not *prohibit* a state from creating such a right of action, and that in the absence of such a prohibition, his action may proceed. Deutsch's argument cannot carry the day. As we explained earlier, the Constitution allocates the pow-

---

**11.** For useful and accessible surveys of these agreements as they apply to war reparations, see *Iwanowa v. Ford Motor Co.,* 67 F.Supp.2d 424, 448–56 (D.N.J.1999), and *Burger–Fischer v. DeGussa AG,* 65 F.Supp.2d 248, 265–73 (D.N.J.1999). The district court in *Deutsch* relied heavily on these cases and adopted their conclusion that Deutsch's claim raised a nonjusticiable political question, *Deutsch,* 2000 WL 33957691, at 2–6, a conclusion with which we disagree. The district court determined that the postwar agreements created the exclusive remedy to the matters raised by Deutsch, and that to order relief would therefore require the court to interfere with the foreign affairs choices of the political branches. *Id.* Under political question doctrine, the court noted, it is impermissible for a court to make policy related to foreign affairs. *Id.* at 2

(citing *Baker v. Carr,* 369 U.S. 186, 211, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). Therefore, the district court supposed, *Deutsch* raised a nonjusticiable political question. The problem with this argument is that it makes every dispute over the proper application of a treaty into a political question, because treaties inherently involve foreign affairs. No political question, however, is raised by the simple application of the requirements of a treaty to which the United States is a party. Treaties have the force of law, *see Missouri v. Holland,* 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920), and, if they are self-executing or have been implemented through legislation, must be applied by the courts. *See United States v. Alvarez–Machain,* 504 U.S. 655, 667, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992).

er over foreign affairs to the federal government exclusively, and the power to make and resolve war, including the authority to resolve war claims, is central to the foreign affairs power in the constitutional design. In the absence of some specific action that constitutes authorization on the part of the federal government, states are prohibited from exercising foreign affairs powers, including modifying the federal government's resolution of war-related disputes.

■■■■ The war with Japan ended with the Treaty of Peace, signed in San Francisco, on September 8, 1951, by the representatives of the United States and 47 other Allied powers and Japan, and ratified by the United States Senate on April 28, 1952. Treaty of Peace with Japan, Sept. 8, 1951, 3 U.S.T. 3169, T.I.A.S. No. 2490. Although the parties dispute whether that treaty by its own terms precludes

the claims brought by any of the Appellants,[12] that is the only dispute regarding the treaty. No party asserts that the treaty either creates—explicitly or implicitly—a private right of action against Japan or its nationals, or authorizes states of the United States to create such a right.[13] Once again, without such authorization, states lack the power to alter the federal government's resolution of disputes relating to the war.[14]

The grievances of at least one class of potential plaintiffs identified in section 354.6, prisoners of war, were addressed by the federal government in domestic legislation. *See* § 354.6(a)(2). Under the War Claims Act of 1948, 50 U.S.C. app. §§ 2001–2017p, assets seized from Germany, Japan, or their nationals within the United States and its territory were used to compensate American prisoners of war whose rights had been violated. *See* U.S.

12. The central disagreement concerns the meaning of Article 14(b) of the treaty, which is quoted in full *supra* note 3. The district judge held that Appellants' claims were waived because they are claims of Allied nationals "arising out of actions taken by [Japanese] nationals in the course of the prosecution of the war." *Id.; Forced Labor (Allied I)*, 114 F.Supp.2d at 944–49. Appellants argue that the actions of the Appellee corporations were not taken "in the course of the prosecution of the war," or that it is an issue of fact whether they were or not.

13. Appellants do assert that, if Article 14 of the treaty waives claims against Japanese nationals, as Appellees assert, then Article 14 is superceded by Article 26. Article 26 provides, in pertinent part:

> Should Japan make a peace settlement or war claims settlement with any State granting that State greater advantages than those provided by the present Treaty, the same advantages shall be extended to the parties to the present Treaty.

Treaty of Peace with Japan, at art. 26. Appellants argue that other foreign states have entered into agreements with Japan that do not

waive private claims and that those agreements thereby extend to those foreign states "greater advantages" than the terms extended to the United States. The district court found that Article 26 confers rights only on the "parties" to the treaties, not on individuals. *Forced Labor (Allied I)*, 114 F.Supp.2d at 949. We agree, at least as to the right to invoke the clause. It is the prerogative of the United States, not of California or of Appellants, to determine whether a foreign state has been granted greater advantages and, if so, whether it is in the interest of the United States to incorporate those advantages (along with any concomitant lesser disadvantages) into the treaty. The United States has not invoked Article 26 to authorize a private right of action. Appellants' reliance on the article is, therefore, unavailing.

14. It is immaterial that many of the Appellants are nationals of two nations, China and Korea, that were not signatories of the San Francisco treaty. When the United States has been a party to a war, the resolution it establishes to that war is the resolution for the whole of the United States. States lack the power to modify that resolution, regardless of the citizenship of those seeking redress.

FOREIGN CLAIMS SETTLEMENT COMMISSION, SETTLEMENT OF CLAIMS BY THE FOREIGN CLAIMS SETTLEMENT COMMISSION FROM SEPTEMBER 14, 1949 TO MARCH 31, 1955, at 10–11 (1955); 50 U.S.C. app. § 2005(d)(2)(A). The Act required prisoners of war to submit their claims to a federal agency, whose decision was final; it conceived of no private right of action against German or Japanese entities. *See* 50 U.S.C. app. § 2010.

California was dissatisfied with how the federal government chose to address the various wartime injuries suffered by victims of the Nazis and their allies after the United States brought the Second World War to a close. The California legislature found that, under the treaties and compensatory programs that the federal government had established, "victims of Nazi persecution have been deprived of their entitlement to compensation for their labor and for injuries sustained while performing that labor as forced or slave laborers prior to and during the Second World War." 1999 Cal. Stat. 216, § 1(b) (codified in notes to Cal.Code Civ. Proc.

§ 354.6). The state legislature therefore enacted section 354.6 to remedy these 54-year–old injuries in a manner favored by California but not provided for by the federal government. Appellants assert that no international agreement or other federal action prohibits California from doing so. However, as we have stated, because the issue is the lack of state power, it is immaterial whether the federal government enacted a prohibition. The federal government, acting under its foreign affairs authority, provided its own resolution to the war; California has no power to modify that resolution.[15]

Before concluding our discussion of this issue, we must consider Appellants' most vigorous argument in favor of the constitutionality of section 354.6: that the provision "presents striking parallels" to HVIRA, the insurance reporting requirement that we upheld in *Gerling*. Appellants correctly note two points of similarity: first, like section 354.6, HVIRA is related to Nazi-era wrongs; second, as under section 354.6, at least as applied to the cases before us, the parties regulated by HVIRA

---

**15.** One might argue that the Holocaust was distinct from the German war effort, that claims for injuries arising from the Holocaust do not, therefore, relate to the war, and that such injuries, because they are unrelated to the war, do not implicate the war powers of the federal government. We need not assume that the acts of enslavement encompassed by section 354.6 served military purposes or advanced the war effort of the Nazis or their allies. We simply note that, by its terms, section 354.6 creates a right of action only for "Second World War" slave labor victims. For the purposes of the provision, the California legislature explicitly defined the harms suffered by such victims as pertaining to the war. Moreover, the federal government's exclusive power to resolve the war necessarily includes an exclusive power to address the injuries that section 354.6 attempts to remedy. The treaties themselves confirm that the federal government regarded all wartime injuries as matters integral to peacemaking, re-

gardless of the purpose or effect of the wrongdoer's acts. In the Paris Reparations Treaty, for example, the United States and the other signatories "agree[d] among themselves that their shares of reparation, as determined by the present Agreement, shall be regarded by each of them as covering all its claims and those of its nationals against the former German Government and its Agencies, of a governmental or private nature arising out of the war." Paris Reparations Treaty, Jan. 14, 1946, art. 2(A), 61 Stat. 3157, 3163; *see also, e.g.,* Treaty of Peace with Hungary, Feb. 10, 1947, art. 30(4), 61 Stat. 2109, 2126 (bilateral treaty between Allied Powers and Hungary) ("Hungary waives on its own behalf and on behalf of Hungarian nationals all claims against Germany and German nationals outstanding on May 8, 1945, except those arising out of contracts and other obligations entered into, and rights acquired, before September 1, 1939.").

are businesses. The similarity ends there, however. Unlike section 354.6, HVIRA does not attempt to require the affected businesses to compensate victims for past wrongs: Specifically, as we noted in *Gerling*, HVIRA does not impose obligations on "European insurance companies to pay or not to pay claims on European policies." *Gerling*, 240 F.3d at 745 (internal quotation marks removed). HVIRA, rather, is merely a reporting requirement and the only consequence of noncompliance is the inability to do business in California in the future. *Id.* Whereas section 354.6 seeks to provide a monetary remedy for decades-old wartime wrongs, HVIRA is a forward-looking regulatory statute.[16] In short, unlike section 354.6, HVIRA does not attempt to hold defendants liable for their past wartime conduct; it therefore does not implicate the exclusive power of the federal government to make and resolve war, including the resolution of claims arising out of such actions.

Section 354.6 runs afoul of the restriction on the exercise of foreign affairs powers by the states. Because California lacks the power to create a right of action—or, alternatively, to resurrect time-barred claims—in order to provide its own remedy for war-related injuries inflicted by our former enemies and those who operated in their territories, we hold that section 354.6 is unconstitutional.

### III. Statutes of Limitations

In addition to section 354.6, Appellants bring various tort claims under common law, California statutory and constitutional law, as well as for violations of international law under the Alien Tort Claims Act, 28 U.S.C. § 1350 ("ATCA"). *See supra.* All these claims are barred by their respective statutes of limitations.

▮ Appellants apparently bring their common law claims under California law, although in many instances they do not identify the jurisdiction under whose law they seek relief. Some of the parties, including both defendants and plaintiffs, are California residents, while others are not; the alleged injuries all took place outside of California. Regardless of the source of the substantive law, because all the claims, including both common law and statutory, were brought in California state court or in a district court within California, we apply to them the statute of limitations that would be applied in California state court.[17] California applies the "governmental interest" approach to conflict of law issues. *Hurtado v. Superior Court*, 11 Cal.3d 574, 579–80, 114 Cal.Rptr. 106, 522 P.2d 666 (1974). Under this approach, the correct choice of law depends on "an analysis of the respective interests of the states involved." *Id.* at 579, 114 Cal.Rptr. 106, 522 P.2d 666. Where the conflict concerns a statute of limitations, the governmental interest approach generally leads California courts to apply California law. Witkin, 3 CALIFORNIA PROCEDURE § 104 (4th ed.1996); *see, e.g., Peterson v. Kennedy*, 771 F.2d 1244, 1251 n. 4 (9th Cir.1985); *American Bank of Commerce v.*

---

**16.** Appellants in *Gerling* originally challenged two other statutes that did attempt to force payment of Nazi-era insurance claims, *see* Cal.Code Civ. Proc. § 354.5; Cal. Ins.Code § 790.15, but those claims were dismissed for lack of standing and not addressed on appeal. *Gerling*, 240 F.3d at 745; *see also Gerling Global Reinsurance Corp. of Am. v. Low*, 296 F.3d 832, 842 & n. 7 (9th Cir.2002), *cert.*

granted sub nom. *Am. Ins. Ass'n v. Low*, 71 U.S.L.W. 3373 (2003).

**17.** The district court addressing the claims brought by Korean and Chinese Appellants found that the non-federal claims would be time-barred under Chinese and Japanese law, as well as under the law of California. *Forced Labor (Koreans)*, 164 F.Supp.2d at 1182.

*Corondoni,* 169 Cal.App.3d 368, 215 Cal. Rptr. 331 (1985), and especially so where California's statute would bar a claim. California's interest in applying its own law is strongest when its statute of limitations is shorter than that of the foreign state, because a "state has a substantial interest in preventing the prosecution in its courts of claims which it deems to be 'stale.' Hence, subject to rare exceptions, the forum will dismiss a claim that is barred by its statute of limitations." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 142, cmt. f (1988).

 All the claims in the cases before us, other than those under the ATCA, have been stale for several decades under the applicable California statutes of limitations. *See* Cal.Code Civ. Proc. § 340 (one-year statute for personal injury torts, wrongful death and false imprisonment); *id.* § 338 (three-year statute for taking of or injury to personal property, and for fraud); Cal. Bus. & Prof.Code § 17208 (four-year statute for claims of unfair business practices). Only an extraordinarily strong interest of a foreign state in keeping these claims alive could overcome the presumption that California will not hear claims that have been stale for so long under its own law. No such strong foreign interest has been demonstrated here.

 The statute of limitations under the ATCA is 10 years. *Doe v. Unocal Corp.,* 2002 WL 31063976, 2002 U.S.App. LEXIS 19263, at *27 (9th Cir. Sept. 18, 2002).[18] Appellants have thus brought these claims far too late as well.[19]

 Some Appellants contend, however, that their claims under both state law and the ATCA are equitably tolled and could therefore survive our invalidation of section 354.6. Although the district court found that they did not allege facts sufficient to trigger equitable tolling, these Appellants contend that they were not required to allege such facts, because a statute of limitations is an affirmative defense, which a plaintiff is not required to anticipate in the complaint. They also contend that even if they were required to allege such facts, the district court should have granted them leave to amend in order to give them the opportunity to do so. The curious aspect of this argument is that all of the Appellants who make this argument *did* plead equitable tolling in their complaints. Furthermore,

---

**18.** The 10–year limit is not stated in the provision. Rather, we adopted it from the Torture Victim Protection Act, *see* Pub.L. No. 102–256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350, *statutory notes*) ("TVPA"), which has an explicit 10–year statute. *Papa v. United States,* 281 F.3d 1004, 1011–13 (9th Cir.2002). We did so because where a federal statute lacks a specified statute of limitations,

> courts apply the limitations period provided by the jurisdiction in which they sit unless "a rule from elsewhere in federal law clearly provides a closer analogy than available state statutes, and when the federal policies at stake and the practicalities of litigation make that rule a significantly more appropriate vehicle for interstitial lawmaking."

*Papa,* 281 F.3d at 1011–12 (citing *North Star Steel Co. v. Thomas,* 515 U.S. 29, 35, 115 S.Ct. 1927, 132 L.Ed.2d 27 (1995)). We held that ATCA was closely analogous to the TVPA both in its purpose and in its mechanism for achieving that purpose. *Papa,* 281 F.3d at 1012. Appellants ask us to reconsider our decision in *Papa,* at least as it applies to the present cases, and hold that the ATCA is more closely analogous to section 354.6 than to the TVPA. The result, Appellants argue, would be that the claims are not barred until 2010. For the reasons we stated in *Papa,* and because we hold that section 354.6 is unconstitutional, we reaffirm that the ATCA statute of limitations in this case, as in other cases, is 10 years.

**19.** Some Appellants who did not bring a claim under the ATCA argue that they should be permitted to amend their complaints to do so. In light of our holding, such an amendment would be futile.

they alleged *facts* that they believed would trigger such tolling. They alleged, for example, that the defendants had kept the plaintiffs ignorant of essential facts in the defendants' possession. The district court considered these alleged facts and found them insufficient to trigger tolling. *Forced Labor (Koreans)*, 164 F.Supp.2d at 1181–82. Although the court's discussion of equitable tolling concerned only the ATCA, its reasoning applies equally to the state law claims. On appeal, these Appellants offer neither a satisfactory answer to the district court's finding regarding equitable tolling nor any hint of any additional facts that they might allege in an amended complaint. Under these circumstances, amendment would be futile. We therefore find no abuse of discretion in the district court's dismissal of the complaints with prejudice.[20]

## IV. Jurisdiction

■ In many of the cases before us, there is indisputable federal jurisdiction.

In some, for example in *Deutsch* and in *Dunn v. Nippon Steel Corp.*,[21] there is diversity jurisdiction. 28 U.S.C. § 1332. Appellants in several other cases, for example in *Terrence v. Mitsui & Co.*, *Wheeler v. Mitsui & Co.*, and *Kim v. Ishikawajima Harima Heavy Indus. Co.*, assert claims under international law, thus giving rise to federal subject matter jurisdiction under 28 U.S.C. § 1331.

■ Among the many cases that have been consolidated, there are some individual cases as to which federal jurisdiction may be uncertain. Appellants in those cases originally sought relief in state court, under state law,[22] against non-diverse defendants. After removal and consolidation, some of the Appellants sought remand to state court. The district court denied their motions, *Forced Labor (Allied I)*, 114 F.Supp.2d at 943, on the ground that "the complaints ..., on their face, implicate the federal common law of for-

**20.** Deutsch argues for the first time on appeal that he should be permitted to amend his complaint to include a claim under the TVPA. He offers no explanation, however, for why he failed to bring that claim in his first amended complaint. Moreover, as noted above, the TVPA has an explicit statute of limitation of 10 years. Deutsch argues that that period commenced on the effective date of the Act, rather than on the date on which the injury was complete. He cites no authority for this proposition, and we do not find it to be a reasonable or plausible one. As Deutsch notes, we have held that the TVPA is applicable to acts that took place prior to the effective date of the Act. *Alvarez–Machain v. United States*, 107 F.3d 696, 702–03 (9th Cir.1996). In *Alvarez–Machain*, however, the plaintiff filed his claim only three years after the date of the alleged injury. *Id.* at 700. Nothing in our cases or the statute suggests that Congress intended the TVPA to open the federal courts to claims that were already more than 40 years old when the statute became effective or that no time limit exists under the TVPA as to the resurrection of claims for

damages that may have occurred in the far distant past. Because the TVPA has a 10–year statute of limitations, permitting Deutsch to amend his complaint would be futile. We therefore affirm the dismissal with prejudice.

**21.** In *Dunn*, the amount in controversy is not stated in the complaint, nor was the amount determined by the district court. However, the Appellant seeks compensation and punitive damages for roughly three years of withheld wages, as well as for severe physical and mental injuries he suffered at the hands of the defendants and their predecessors during that time. There is thus no doubt that this case meets the $75,000 minimum amount in controversy required for diversity jurisdiction under 28 U.S.C. § 1332.

**22.** Although some plaintiffs amended or sought to amend their complaints, after removal, to include federal claims, such amendments do not bear on the evaluation of removal jurisdiction. *Abada v. Charles Schwab & Co.*, 300 F.3d 1112, 1117 (9th Cir.2002).

eign relations." *Id.* Appellees opposed remand on other grounds as well. Appellants in some of these cases—not precisely the same group that moved for remand below—now argue that federal jurisdiction is lacking.

Normally, of course, we would address all jurisdictional issues as an initial matter, as they would determine whether we could proceed to the merits. The situation is different with respect to the cases consolidated here, because the cases over which jurisdiction is disputed raise no merits issues that are not also raised by one or more cases over which jurisdiction is certain and which have been consolidated with the disputed cases. In short, we are compelled to address all of the merits issues in these consolidated cases, regardless of whether there is jurisdiction over each of them. Furthermore, the ultimate survival of all of these cases depends on the validity of the provisions of section 354.6. In light of our holding that section 354.6 is unconstitutional, remand to state court of the cases of uncertain federal jurisdiction would be futile, as the state court would simply dismiss the claims with prejudice. *See Bates v. Jones,* 127 F.3d 870, 873 (9th Cir.1997) (noting that the California Supreme Court "has yet to disregard a directly applicable decision of this court on a question of federal law"). Therefore, our determination of the uncertain jurisdictional issues could have no effect on the outcome of any of the cases.

For these reasons, we decline to address the uncertain jurisdictional issues and simply affirm the district court's dismissal of all the cases before us.

## Conclusion

For the foregoing reasons, we hold that California Code of Civil Procedure section 354.6 is an unconstitutional intrusion on the foreign affairs power of the United States and that Appellants' remaining claims are barred by the applicable statutes of limitations. The judgments of the district courts are

**AFFIRMED.**