**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

VAZKEN MOVSESIAN; HARRY
ARZOUMANIAN; GARO AYALTIN;
MIRAN KHAGERIAN; ARA
KHAJERIAN, individually and on
behalf of all others similarly
situated including thousands of
senior citizens, disabled persons,
and orphans as well as on behalf
of the general public and acting in
the public interest,
    *Plaintiffs-Appellees,*

   v.

VICTORIA VERSICHERUNG AG, a
German corporation; ERGO
VERSICHERUNGSGRUPPE AG, a
German corporation,
      *Defendants,*

   and

MUNCHENER RUCKVERSICHERUNGS-
GESELLSCHAFT AKTIENGESELLSCHAFT
AG, a German corporation,
    *Defendant-Appellant.*

No. 07-56722

D.C. No. CV-03-
09407-CAS-JWJ

OPINION

Appeal from the United States District Court
for the Central District of California
Christina A. Snyder, District Judge, Presiding

Argued and Submitted
December 8, 2008—Pasadena, California

Filed August 20, 2009

11415

Before: Harry Pregerson, Dorothy W. Nelson and
David R. Thompson, Circuit Judges.

Opinion by Judge Thompson;
Dissent by Judge Pregerson

## COUNSEL

Neil Michael Soltman, Los Angeles, California, for the defendant/appellant.

Brian S. Kabateck, Los Angeles, California, for the plaintiffs/appellees.

**OPINION**

THOMPSON, Senior Circuit Judge:

Section 354.4 of the California Code of Civil Procedure extends the statute of limitations until 2010 for claims arising out of life insurance policies issued to "Armenian Genocide victim[s]." Cal. Civ. Proc. Code § 354.4(c) (West 2006). The primary issue in this appeal is whether § 354.4 interferes with the national government's conduct of foreign relations. We conclude that it does, and accordingly, we hold that the California statute is preempted. The district court's order denying the Rule 12(b)(6) motion to dismiss is reversed.

**I. Background**

In 2000, the California Legislature enacted Senate Bill 1915, which amended California's Code of Civil Procedure to provide California courts with jurisdiction over certain classes of claims arising out of insurance policies that were held by "Armenian Genocide vitcim[s]." Sen. Bill No. 1915 (1999-2000 Reg. Sess.), 2000 Cal. Legis. Serv. 543 (West 2000), codified at Cal. Civ. Proc. Code § 354.4. The Bill also amended the Code to extend the statute of limitations for such claims until December 31, 2010. *Id.* Section 354.4, in its entirety, provides:

> (a) The following definitions govern the construction of this section:
>
> (1) "Armenian Genocide victim" means any person of Armenian or other ancestry living in the Ottoman Empire during the period of 1915 to 1923, inclusive, who died, was deported, or escaped to avoid persecution during that period.
>
> (2) "Insurer" means an insurance provider doing business in the state, or whose contacts in the state

satisfy the constitutional requirements for jurisdiction, that sold life, property, liability, health, annuities, dowry, educational, casualty, or any other insurance covering persons or property to persons in Europe or Asia at any time between 1875 and 1923.

(b) Notwithstanding any other provision of law, any Armenian Genocide victim, or heir or beneficiary of an Armenian Genocide victim, who resides in this state and has a claim arising out of an insurance policy or policies purchased or in effect in Europe or Asia between 1875 and 1923 from an insurer described in paragraph (2) of subdivision (a), may bring a legal action or may continue a pending legal action to recover on that claim in any court of competent jurisdiction in this state, which court shall be deemed the proper forum for that action until its completion or resolution.

(c) Any action, including any pending action brought by an Armenian Genocide victim or the heir or beneficiary of an Armenian Genocide victim, whether a resident or nonresident of this state, seeking benefits under the insurance policies issued or in effect between 1875 and 1923 shall not be dismissed for failure to comply with the applicable statute of limitation, provided the action is filed on or before December 31, 2010.

(d) The provisions of this section are severable. If any provision of this section or its application is held invalid, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application.

In the legislative findings accompanying the statute, the Legislature provides formal recognition to an "Armenian Genocide":

> The Legislature recognizes that during the period from 1915 to 1923, many persons of Armenian ancestry residing in the historic Armenian homeland then situated in the Ottoman Empire were victims of massacre, torture, starvation, death marches, and exile. This period is known as the Armenian Genocide.

Sen. Bill No. 1915 at § 1.

Section 354.4 was modeled after §§ 354.5 and 354.6, which extended the statute of limitations until 2010 for Holocaust-era insurance claims and World War II slave labor claims, respectively. Sen. Jud. Com., analysis of Sen. Bill No. 1915 (1999-2000 Reg. Sess.) May 9, 2000, pp. 2, 4. Both of these sister statutes have been found unconstitutional, because they interfered with the national government's foreign affairs power. *Deustch v. Turner*, 324 F.3d 692, 716 (9th Cir. 2003) (finding § 354.6 unconstitutional); *Steinberg v. Int. Comm. on Holocaust Era Ins. Claims*, 34 Cal. Rptr. 3d 944, 953 (Cal. Ct. App. 2005) (finding § 354.5 unconstitutional).

In December 2003, Vazken Movsesian ("Movsesian") filed this class action against Victoria Verisherung AG ("Victoria"), Ergo Verischerungsgruppe AG ("Ergo"), and Munchener Ruckverischerungs-Gesellschaft Aktiengesell-schaft ("Munich Re"). Movsesian and his fellow class members are persons of Armenian descent who claim benefits from insurance policies issued by Victoria and Ergo. Munich Re is the parent company of Victoria and Ergo. Movsesian seeks damages from all three companies for breach of written contract, breach of the covenant of good faith and fair dealing, unjust enrichment, and other related claims. Munich Re filed a Rule 12(b)(6) motion to dismiss the claims, arguing that the class members lacked standing to bring claims under § 354.4, and contending that it was not a proper defendant under § 354.4. Munich Re also challenged the constitutionality of § 354.4, on the grounds that it violated the due process clause

of the United States Constitution and was preempted under the foreign affairs doctrine.

The district court granted Munich Re's motion to dismiss the claims for unjust enrichment and constructive trust, and denied Munich Re's motion to dismiss the claims for breach of contract and breach of the covenant of fair dealing. The court held that the class members had standing to bring their claims, and that Munich Re was a proper defendant under § 354.4. The court rejected Munich Re's due process challenge, and held that § 354.4 was not preempted under the foreign affairs doctrine.

Munich Re filed a motion to certify the district court's order for interlocutory appeal, and to stay the action pending appeal. The district court granted the motion, and stayed the case. Within the ten-day window provided by 28 U.S.C. § 1292(b), Munich Re petitioned this court for permission to pursue an interlocutory appeal, which we granted.

On appeal, the parties address three issues: first, whether § 354.4 is preempted under the foreign affairs doctrine; second, whether Munich Re is a proper defendant; and third, whether the Plaintiff-Appellees have standing to bring these claims.[1] We conclude that § 354.4 impermissibly infringes on the federal government's foreign affairs power, and is preempted. We do not reach the other issues.

On December 4, 2008, our court received a letter from the Turkish Ambassador via facsimile. Letter from Nabi Sensoy, the Turkish Republic's Ambassador to the United States, to Molly Dwyer, Clerk of the United States Court of Appeals for the Ninth Circuit (December 4, 2008). The letter expresses Turkey's opposition to § 354.4, and urges the court to overturn the California statute. At oral argument, Munich Re

---

[1]Neither party addresses the due process issue on appeal.

asked us to take judicial notice of the letter; Movsesian objected.

We decline to take judicial notice of the letter, because the letter was submitted after -and apparently in response to- the district court's decision. *See, e.g., Ctr. for Bio-Ethical Reform, Inc. v. City and County of Honolulu*, 455 F.3d 910, 918 n.3 (2006) (declining to take judicial notice of documents issued after the district court's decision). Even if we did take notice of the letter, however, it would not alter our decision in this case.

## II. Standard of Review

Appellate jurisdiction under § 1292(b) "applies to the *order* certified to the court of appeals, and is not tied to the particular question formulated by the district court." *Yamaha Motor Corp., USA v. Calhoun*, 516 U.S. 199, 205 (1996). We have jurisdiction to decide all questions "fairly raised" by the issue under review. *Lee v. Am. Nat. Ins. Co.*, 260 F.3d 997, 1000-01 (9th Cir. 2001). We will not address issues outside the order appealed from, or issues not yet considered by the district court. *Life Ins. Co. v. Reichardt*, 591 F.2d 499, 505-06 (9th Cir. 1979).

We review de novo a district court's grant of a Rule 12(b)(6) motion to dismiss. *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1061 (9th Cir. 2004). All well-pleaded factual allegations are to be construed in the light most favorable to the pleader, and accepted as true. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, ___, 127 S. Ct. 1955, 1965 (2007); *Johnson v. Riverside Healthcare System*, 534 F.3d 1116, 1122 (9th Cir. 2008). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at ____, 127 S. Ct. at 1966 (internal quotation marks omitted).

**III. The Constitutionality of § 354.4 Under the Foreign Affairs Doctrine**

This case presents the issue whether § 354.4 of the California Code of Civil Procedure interferes with the national government's power to conduct foreign affairs. Munich Re contends that § 354.4 is preempted under the foreign affairs doctrine in two ways: first, that it is preempted by the Claims Agreement of 1922, and the War Claims Act of 1928; and second, that it conflicts with the Executive Branch's policy prohibiting legislative recognition of an "Armenian Genocide." We conclude that § 354.4 conflicts with Executive Branch foreign policy, and thus, is preempted. We need not decide the questions whether § 354.4 is preempted by the Claims Agreement or the War Claims Act.

[1] The Supreme Court has long recognized that the Executive Branch's foreign policy preferences are entitled to preemptive weight when they take the form of executive agreements. *See, e.g., Dames & Moore v. Regan*, 453 U.S. 654 (1981); *United States v. Pink*, 315 U.S. 203 (1941); *United States v. Belmont*, 301 U.S. 324 (1937). In *Garamendi*, the Supreme Court recognized for the first time that "presidential foreign policy" itself may carry the same preemptive force as a federal statute or treaty. *Am. Ins. Assoc. v. Garamendi*, 539 U.S. 396, 421 (2003). Unlike in previous cases, the presidential foreign policy was not contained in a single executive agreement. Instead, the policy was "embod[ied]" in several executive agreements, as well as in various letters and statements from executive branch officials at congressional hearings. *Id.* at 421-23. In sum, the Court held that in the realm of foreign affairs, "[t]he exercise of the federal executive authority means that state law must give way where . . . there is evidence of clear conflict between the policies adopted by the two." *Id.*

[2] To determine whether California's Holocaust Victims Insurance Relief Act (HVIRA) was preempted by presidential

foreign policy, the *Garamendi* Court employed a traditional conflict preemption analysis. *Id*. at 420-27. First, the Court considered whether there was an "express federal policy" on point. *Id*. at 420-25. Next, the Court analyzed whether the California statutory scheme posed a "clear conflict." *Id*. at 425-27. Here, just as in *Garamendi*, the "question relevant to preemption in this case is conflict." And just as in *Garamendi*, "the evidence here is more than sufficient to demonstrate that the state Act stands in the way of [the President's] diplomatic objectives." *Id*. at 427 (citing *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 386 (2000)).

### 1. Express Federal Policy

**[3]** Munich Re contends that presidential foreign policy prohibits legislative recognition of an "Armenian Genocide," and that this policy preempts § 354.4. In support of this argument, Munich Re points to several failed House Resolutions, H. R. Res. 106, 110th Congress (2007); H. R. Res. 193, 108th Congress (2003); H. R. Res. 596, 106th Congress (2000). Each of these resolutions formally recognized the "Armenian Genocide." Each time, the Administrations of President Bush and President Clinton took specific action, privately and publicly, to defeat these measures.

### a. *House Resolution 596*

House Resolution 596, entitled "Affirmation of the United States Record on the Armenian Genocide Resolution," "[c]all[ed] upon the President to ensure that the foreign policy of the United States reflects appropriate understanding and sensitivity concerning issues related to human rights, ethnic cleansing, and genocide documented in the United States record relating to the Armenian Genocide, and for other purposes." H. R. Res. 596, 106th Cong. (2000). In support of the Resolution, the House passed a number of legislative findings, including the following:

> The Armenian Genocide was conceived and carried out by the Ottoman Empire from 1915 to 1923, resulting in the deportation of nearly 2,000,000 Armenians, of whom 1,500,000 men, women, and children were killed, 500,000 survivors were expelled from their homes, and which succeeded in the elimination of the over 2,500-year presence of Armenians in their historic homeland.

*Id.* at § 2(1). In all, the Resolution uses the phrase "Armenian Genocide" at least twenty-four times.

President Clinton personally expressed his opposition to the Resolution in a letter to Speaker Hastert. Letter to the Speaker of the House of Representatives on a Resolution on Armenian Genocide, 3 Pub. Papers 2225-26 (Oct. 19, 2000). The President explained the potential negative impact the Resolution would have on the nation's foreign policy interests:

> [I] am deeply concerned that consideration of H. Res. 596 at this time could have far-reaching negative consequences for the United States. We have significant interests in this troubled region of the world: containing the threat posed by Saddam Hussein; working for peace and stability in the Middle East and Central Asia; stabilizing the Balkans; and developing new sources of energy. Consideration of the resolution at this sensitive time will not only negatively affect those interests, but could undermine efforts to encourage improved relations between Armenia and Turkey—the very goal the Resolution's sponsors seek to advance.

*Id.* In sum, President Clinton urged the Speaker "in the strongest terms not to bring this Resolution to the floor at this time." *Id.*

In addition, several senior-level Administration officials sent letters to the Chairman of the Committee on International

Relations, reiterating the Administration's opposition to the Resolution. H.R. Rep. No. 106-933, at 16-19 (2000). The Assistant Secretary of State expressed the Administration's belief that "legislative measures" were not the appropriate means of addressing the "sensitive issue" raised in the Resolution. *Id.* at 17. The Secretary of Defense and the Undersecretary of Defense underscored the Administration's concern that the Resolution "would complicate our efforts to build relationships and protect our interests in the region and sustain our positive relationship with a key, strategically placed ally." *Id.* at 16-18. The Resolution was reported out of committee, but never brought to a vote on the floor.

### b. *House Resolution 193*

In 2003, a general resolution "reaffirming support of the Convention on the Prevention and Punishment of the Crime of Genocide" was introduced in the House. H.R. Res. 193, 108th Cong. (2003). Unlike the other two resolutions discussed in this section, House Resolution 193 did not contain any legislative findings, or even any reference to Turkey or the Ottoman Empire. Nevertheless, the Bush Administration strongly opposed it. The Administration's opposition to House Resolution 193 was based solely on two words found in the resolution: "Armenian Genocide." An official from the State Department explained:

> I am writing to express the Administration's opposition to the wording of H. Res. 193 of April 10, 2003 . . . . [W]e oppose HR 193's reference to the 'Armenian Genocide.' Were this wording adopted it could complicate our efforts to bring peace and stability to the Caucasus and hamper ongoing attempts to bring about Turkish-Armenian reconciliation. We continue to believe that fostering a productive dialogue on these events is the best way for Turkey and Armenia to build a positive and productive relationship. Dec-

larations such as this one, however, hinder rather than encourage the process.

H.R. Rep. No. 108-130, at 5-6 (2003). The Bush Administration echoed the Clinton Administration's belief that "legislation on the issue is counterproductive." *Id.* at 6. This time, the Resolution was reported out of committee and calendered, but was never actually brought to a vote on the floor.

### c. *House Resolution 106*

In 2007, the House entertained yet another resolution that would provide official recognition to an "Armenian Genocide." House Resolution 106 was nearly indistinguishable from House Resolution 596, discussed above. The Bush Administration renewed its opposition to legislative recognition of an "Armenian Genocide" through a joint letter from Secretary of State Condoleeza Rice and Secretary of Defense Robert Gates to Speaker Nancy Pelosi. Letter from Condoleeza Rice, Sec'y of State, and Robert M. Gates, Sec'y of Defense, to Nancy M. Pelosi, Speaker of the House of Representatives (March 7, 2001). The Secretaries sent an identical letter to the Minority Leader of the House, Representative John Boehner. Letter from Condoleeza Rice, Sec'y of State, and Robert M. Gates, Sec'y of Defense, to John A. Boehner, Minority Leader of the House of Representatives (March 7, 2001).

In their joint letter, the Secretaries underscored the importance of Turkey's contributions to the war in Iraq. *See* Letter from Condoleeza Rice and Robert Gates to Nancy Pelosi, *supra*, at 2. The Secretaries noted that when the French Assembly voted in favor of a similar bill, the Turkish military cut off contact with the French military and terminated defense contracts under negotiation. *Id.* The Secretaries warned that "[a] similar reaction by the Government of Turkey to a House resolution could harm American troops in the field, constrain our ability to supply our troops in Iraq and

Afghanistan, and significantly damage our efforts to promote reconciliation between Armenia and Turkey[.]" *Id.* In conclusion, the Secretaries "strongly urge[d] [the Speaker] to refrain from allowing the resolution to reach the House floor." *Id.*

Despite the Secretaries' exhortations, the House Committee on Foreign Affairs passed a motion to order the bill reported. H.R. Res. 106, 110th Cong. (as reported by H. Comm. on Foreign Aff., Oct. 10, 2007). In response, President Bush made the following statement:

> On another issue before Congress, I urge members to oppose the Armenian genocide resolution now being considered by the House Foreign Affairs Committee. We all deeply regret the tragic suffering of the Armenian people that began in 1915. This resolution is not the right response to these historic mass killings, and its passage would do great harm to our relations with a key ally in NATO and in the global war on terror.

Press Release, White House Office of the Press Secretary, President Bush Discusses Foreign Intelligence Surveillance Act Legislation (Oct. 10, 2007).

Following President Bush's statements, no further action was taken on the Resolution.

### d. *Emergence of the Express Policy*

**[4]** The foregoing account of negotiations between the Executive Branch and Congress, and the public statements and letters of two Presidents, clearly establish a presidential foreign policy preference against providing legislative recognition to an "Armenian Genocide." The *Garamendi* Court relied on similar communications between the Administration and state legislative and executive officials, in addition to sev-

eral executive agreements, in finding that HVIRA was preempted. *Garamendi*, 539 U.S. at 408-11.

Unlike the presidential foreign policy at issue in *Garamendi*, the presidential foreign policy in the present case is not embodied in any executive agreement. This does not, however, detract from the policy's preemptive force. The executive agreements discussed in *Garamendi* did not apply to all of the claims at issue, so they could not have been central to the Court's finding of preemption in that case. *Id.* at 417.

Furthermore, the preemptive power of the federal policy is not derived from the form of the policy, but rather from the source of the executive branch's authority to act. Presidential foreign policy only carries preemptive weight when the executive authority is validly exercised — as measured by the tripartite framework set forth by Justice Jackson in *Youngstown*. *Medellín v. Texas*, 552 U.S. ___, ___, 128 S. Ct. 1346, 1369-72 (2008) (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring)). In prior cases where the presidential policy at issue implicated criminal law (an area traditionally left to the states to regulate), or foreign commerce (an area delegated by the Constitution to Congress), the Court has refused to accord the policy preemptive effect. *See, e.g., Medellín*, 128 S. Ct. at 1369-72; *Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 329-30 (1994). Here, however, the presidential policy concerns national security, a war in progress, and diplomatic relations with a foreign nation. The Constitution squarely, if not solely, vests these powers with the Executive Branch. U.S. Const. art. II, § 2, cl. 1; *id.* at § 2, cl. 2; *id.* at § 3; *see also Medellín*, 128 S. Ct. at 1367 (holding that the President has the "lead role" in making "sensitive foreign policy decisions"); *Garamendi*, 539 U.S. at 414; *Deutsch*, 324 F.3d at 708-09 (enumerating the foreign affairs powers delegated by the Constitution to the President).

**[5]** The President acts well within his constitutionally delegated powers by developing and enforcing the policy refusing to provide official recognition to an "Armenian Genocide." Accordingly, the presidential policy is entitled to preemptive effect. *See, e.g.*, *Medellín*, 128 S. Ct. at 1367 n.13, 1367-71 (suggesting that the President, in the exercise of his Article II powers, could take action which preempts conflicting state law, but refusing to find such preemption in that case); *cf. Barclays Bank PLC*, 512 U.S. at 330 ("Executive Branch communications that express federal policy but lack the force of law cannot render unconstitutional California's otherwise valid, congressionally condoned, use of worldwide combined reporting.").

Even if the policy implicated a power shared by the President and Congress, Congress's documented deference in this case lends the presidential policy additional authority. *See Medellín*, 128 S. Ct. at 1368*; Youngstown*, 343 U.S. at 637. The President and his senior officials lobbied Congress, privately and publicly, to implement the policy. Each time, Congress deferred to the President's authority, and did not bring the Resolution to a vote. Under the *Youngstown* framework, this congressional acquiescence infuses the President's authority to act with additional support. *See Medellín*, 128 S. Ct. at 1368*; Youngstown*, 343 U.S. at 637.

**[6]** In sum, we conclude there is an express federal policy prohibiting legislative recognition of an "Armenian Genocide," as embodied in the previously mentioned statements and letters of the President and other high-ranking Executive Branch officials. This policy is a valid exercise of the President's Article II powers. In light of this, and in light of Congress's deference to the Executive Branch on this matter, the policy is entitled to preemptive weight.

### 2. *Clear Conflict*

We next consider whether § 354.4 clearly conflicts with the presidential foreign policy prohibiting legislative recognition

of an Armenian Genocide. We conclude that it does. The conflict is clear on the face of the statute: by using the phrase "Armenian Genocide," California has defied the President's foreign policy preferences.

[7] The language of the California statute is very similar to that of the failed House Resolutions. The California Legislature made the following findings in support of § 354.4:

> The Legislature recognizes that during the period from 1915 to 1923, many persons of Armenian ancestry residing in the historic Armenian homeland then situated in the Ottoman Empire were victims of massacre, torture, starvation, death marches, and exile. This period is known as the Armenian Genocide.

This language closely parallels the legislative findings in House Resolutions 596 and 106, which the Executive Branch vehemently opposed. Section 354.4 implicates the same concerns raised by the Executive Branch in response to these resolutions.

[8] Movsesian contends that given § 354.4's severability provision, the constitutionality of § 354.4(c) should be analyzed distinctly. Even assuming subsection (c) could be separated from the constitutional deficiencies underlying the rest of the statute, the subsection would still conflict with the federal policy at issue. Section 354.4(c) contains two references to the "Armenian Genocide." As discussed above, the Executive Branch opposed House Resolution 193 simply because it contained the phrase "Armenian Genocide." The heart of § 354.4's conflict with the presidential foreign policy lies in these two words. By choosing to use the words "Armenian Genocide," § 354.4 directly contradicts the President's express foreign policy preference.

Movsesian ridicules the idea that two words could have such a "talismanic" effect. The symbolic effect of the words,

however, is precisely the problem. The federal government has made a conscious decision not to apply the politically charged label of "genocide" to the deaths of these Armenians during World War I. Whether or not California agrees with this decision, it may not contradict it. *See Garamendi*, 539 U.S. at 427. When it comes to dealings with foreign nations, "state lines disappear." *Belmont*, 301 U.S. at 331. California may not assert a "distinct juristic personality." *Pink*, 315 U.S. at 230.

If § 354.4 provoked Turkey's ire, it is the nation as a whole — not just California — that would suffer. "If state action could defeat or alter our foreign policy, serious consequences might ensue. The nation as a whole would be held to answer if a State created difficulties with a foreign power." *Pink*, 315 U.S. at 232. The Bush Administration warned that American recognition of an "Armenian Genocide" could endanger America's alliance with Turkey, and thus, our troops on the ground in Iraq. *See* Letter from Condoleeza Rice and Robert Gates to Nancy Pelosi, *supra* at 2.

**[9]** Section 354.4 also threatens to undermine the Executive Branch's diplomatic relations with Turkey. States may not "compromise the very capability of the President to speak for the nation with one voice in dealing with other governments." *Garamendi*, 539 U.S. at 424. Here, § 354.4 "undercuts the President's diplomatic discretion and the choice he has made in exercising it." *Id*. at 423-24.

In *Garamendi* and *Crosby*, the Court struck down state statutes which undermined the President's diplomatic discretion. *Id.*; *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000). By providing explicit recognition to the "Armenian Genocide," § 354.4 threatens to have the same deleterious effect. The Executive Branch chose to address the issue through the medium of presidential speeches, not legislation: "The President believes that the proper way to address this issue and express our feelings about it is through the presiden-

tial message and not through legislation . . . . What [President Bush] wants is for the presidential message to be the thing that stands for the American response to this, not legislation passed by the House of Representatives." *See* Press Release, White House Office of the Press Secretary, Press Briefing by Dana Perino (Oct. 11, 2007). California has done what Congress declined to do: it has defied the President's foreign policy preferences, and has undermined the President's diplomatic power.

Finally, we must address the district court's conclusion that the presidential policy prohibiting Congress from recognizing an "Armenian Genocide" does not apply to individual states. In support of this conclusion, the district court noted that thirty-nine other states have passed legislation recognizing the "Armenian Genocide," and neither the federal government nor Turkey expressed any opposition to these state statutes.

The district court's reasoning is not persuasive for several reasons. First, legislation enacted by other states is irrelevant to the question of whether § 354.4 is preempted by presidential foreign policy. Furthermore, there is no citation or evidence in the record of these other thirty-nine state statutes which purportedly reference the "Armenian Genocide."

Second, the fact that the federal government has not expressly prohibited states from using the phrase "Armenian Genocide" is not outcome-determinative. In *Deutsch*, this court rejected a similar argument, and refused to recognize a private cause of action for war injuries. Though the relevant treaties did not expressly prohibit such actions, the *Deutsch* court held that "[w]ithout [explicit] authorization, states lack the power to alter the federal government's resolution of disputes relating to the war." *Deutsch*, 324 F.3d at 714. Though the instant case does not concern war injuries and reparations, *Deutsch*'s reasoning is still applicable. The power to conduct diplomatic relations and negotiations, like the war powers, is vested exclusively with the federal government. U. S. Const.

art. I, § 8; *id.* at art. II, § 3. Absent explicit authorization, states may not modify or alter the nation's foreign policy. *Deutsch*, 324 F.3d at 713-14.

**[10]** In sum, § 354.4 conflicts with the Executive Branch's clearly expressed foreign policy refusing to provide official legislative recognition to the "Armenian Genocide." The Executive Branch policy is entitled to preemptive weight, because the Executive has the authority to make this policy, and Congress has deferred to the Executive's will in this matter. Section 354.4 impermissibly impairs the President's ability to speak with one voice for the nation in the realm of foreign affairs, and undermines his diplomatic authority.

As in *Garamendi*, the express presidential foreign policy and the clear conflict raised by § 354.4 are "alone enough to require state law to yield." *Garamendi*, 539 U.S. at 425. The *Garamendi* Court, however, went on to consider the strength of California's interest in enacting HVIRA, observing: "If any doubt about the clarity of the conflict remained . . . it would have to be resolved in the National Government's favor, given the weakness of the State's interest." *Id.* Accordingly, we will also address the strength of California's interest in enacting § 354.4.

### 3. *California's Interest in § 354.4*

**[11]** The district court erroneously held that § 354.4 was within the state's traditional area of competence because it was a procedural rule extending the statute of limitations and reviving previously barred claims. We explicitly rejected this reasoning in *Deutsch*. *Deutsch*, 324 F.3d at 707 (repudiating Appellants' attempts to "characterize Section 354.6 as a purely procedural measure"). Nor is the statute saved by Movsesian's attempts to characterize § 354.4 as quotidian insurance regulation. *See Garamendi*, 539 U.S. at 425-26 (rejecting purported state interest in regulating insurance business and blue sky laws).

Courts have consistently looked past "superficial" state interests to ascertain true legislative intent. *See, e.g., Garamendi*, 539 U.S. at 425-26 (rejecting purported state interest in regulating insurance business and blue sky laws); *Crosby*, 530 U.S. 363 (rejecting purported state interest in taxing and spending); *Zschernig v. Miller*, 389 U.S. 429, 437-38 (1968) (rejecting purported state interest in regulating descent of property); *Deutsch*, 324 F.3d at 707 (rejecting purported state interest in procedural rules).

**[12]** Here, as in *Deutsch* and *Garamendi*, California's "real desiderata" is to provide a forum for the victims of the "Armenian Genocide" and their heirs to seek justice. *Garamendi*, 539 U.S. at 425; *Deutsch*, 324 F.3d at 707. By opening its doors as a forum to all "Armenian Genocide" victims and their heirs and beneficiaries, California expresses its dissatisfaction with the federal government's chosen foreign policy path. *Garamendi* and *Deutsch* clearly hold that this is not a permissible state interest. *Garamendi*, 539 U.S. at 427; *Deutsch*, 324 F.3d at 712.

## IV. Conclusion

**[13]** California Code of Civil Procedure § 354.4 is preempted because it directly conflicts with the Executive Branch's foreign policy refusing to provide official recognition to the "Armenian Genocide." Far from concerning an area of traditional state interest, § 354.4 impinges upon the National Government's ability to conduct foreign affairs. The district court's order denying the Rule 12(b)(6) motion to dismiss is REVERSED. This cause is REMANDED to the district court for further proceedings consistent with this opinion.

---

PREGERSON, Circuit Judge, dissenting:

The majority holds that California's attempt to regulate insurance does not fall within the realm of traditional state

interests. I disagree. The legislative findings accompanying California Code of Civil Procedure § 354.4 recognize that thousands of California residents and citizens have often been deprived of their entitlement to benefits under certain insurance policies. S. 1915, 1999-2000 Reg. Sess. (Cal. 2000) at § 1(b). "States have broad authority to regulate the insurance industry." *Am. Ins. Ass'n v. Garamendi,* 539 U.S. 395, 434 n.1 (2003) (Ginsberg, J. dissenting) (citation omitted). California has not exceeded that authority merely by "assigning special significance to an insurer's treatment arising out of a[ ] [particular] era . . . ." *Id.* California's interest in ensuring that its citizens are fairly treated by insurance companies over which the State exercises jurisdiction is hardly a superficial one.

The strength of this traditional state interest weighs against preemption in a case, such as the case before us, where there is doubt about the clarity of the conflict between state law and federal policy. Indeed, there is no conflict. I can find no evidence of any express federal policy forbidding states from using the term "Armenian Genocide." The majority accurately states that the "federal government has made a conscious decision not to apply the politically charged label of 'genocide' to the deaths of [ ] Armenians during World War I. Maj. Op. at 11433. Nowhere, however, does the majority point to any evidence of an express federal policy barring states from so doing.

The majority's reliance on *Deutsch v. Turner*, 324 F.3d 692 (9th Cir. 2005), is misplaced. Whether California has, while acting within its authority to regulate the insurance industry, intruded upon the province of the federal government has no bearing on the existence of, or conflict with, an express federal policy applicable to the states.

There is no express federal policy forbidding California from using the term "Armenian Genocide" in the course of exercising its traditional authority to regulate the insurance

industry. Accordingly, I dissent. I would affirm the district court.